[Cite as *State v. Dawson*, 2017-Ohio-2957.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 15 MA 0118 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| LARRY DAWSON, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:      Criminal Appeal from the Court of
Common Pleas of Mahoning County,
Ohio
Case No. 13 CR 492

JUDGMENT:      Affirmed.

APPEARANCES:

For Plaintiff-Appellee:      Atty. Paul J. Gains
Mahoning County Prosecutor
Atty. Ralph M. Rivera
Assistant Prosecuting Attorney
21 West Boardman St., 6th Floor
Youngstown, Ohio 44503

For Defendant-Appellant:      Atty. Rhys Cartwright-Jones
42 North Phelps Street
Youngstown, Ohio 44503

JUDGES:

Hon. Carol Ann Robb
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated: May 23, 2017

ROBB, P.J.

{¶1}   Defendant-Appellant Larry Dawson appeals from his conviction and sentence entered in Mahoning County Common Pleas Court for felony murder, a violation of R.C. 2903.02(B).  Appellant asserts four arguments for why his conviction should be overturned.  First, he argues the use of child endangering as the predicate offense to felony murder violated his due process rights.  Second, he argues there is insufficient evidence Appellant abused the victim and proximately caused the death.  Third, he asserts the conviction is against the manifest weight of the evidence.  Lastly, he contends there were multiple instances of harmless error during the trial which resulted in cumulative error requiring a new trial.  For the reasons expressed below, none of these arguments have merit.  Thus, the conviction and sentence are affirmed.

*Statement of the Facts and Case*

{¶2}   Appellant and Rhea Stewart had one child, RayVon; the child was born September 8, 2011.  Tr. 259.  Although Appellant and Steward were not together, Appellant spent time with the child.  Tr. 266, 271.  On Saturday, December 8, 2012 Stewart took the 15 month old toddler to stay with Appellant for a couple days; the toddler was scheduled to stay at Appellant's house on 3031 Oregon Street, Youngstown, Ohio from Saturday December 8, 2012 through Thursday, December 13, 2012.  12/13/12 Interview State's Exhibit 8.  Appellant lived with his girlfriend, Ashlee Artist, and her son, who was a couple months older than RayVon.

{¶3}   Stewart described RayVon as a typical 15 month old who was walking and learning to talk.  Both Appellant and Artist confirmed the toddler was walking.  The child's pediatrician also testified the toddler was developmentally a normal 15 month old.

{¶4}   During the visit, Appellant was the child's primary caregiver.   At approximately 3:00 pm on Wednesday, Artist called 911 requesting an ambulance because Appellant had found RayVon unresponsive in the crib and white foam was coming out of his nose and mouth.  The 911 operator instructed them how to administer CPR and told them an ambulance was on the way.

**{¶5}** Officer Assad Chaibi of the Youngstown Police Department arrived on the scene prior to the ambulance. When he arrived, Appellant and Artist were outside the home. Tr. 312. The officer described Appellant's demeanor as very odd for a father; he stated Appellant was not emotional and did not seem concerned. Tr. 315. The officer found the toddler lying on a couch with a liquid substance coming out of his mouth and nose. Tr. 132. The officer began administering CPR. Tr. 313.

**{¶6}** Once the ambulance arrived, the paramedic, Kimberly Nosek, administered CPR. Tr. 339. Upon asking Appellant questions about the toddler, she noted Appellant seemed unattached to the situation. Tr. 343. She avowed she asked Appellant if the child had experienced any accidents, falls, or hit his head. Tr. 344. Appellant responded no. Tr. 344.

**{¶7}** The child was taken to St. Elizabeth's Health Center in Youngstown and then was flown to Akron Children's Hospital in Akron, Ohio. Dr. Vivek Malhotra, a pediatric intensivist at Akron Children's Hospital, testified when RayVon arrived at the hospital there was no evidence of clinical brain function. Tr. 400. In examining his eyes, the doctor observed bilateral retinal hemorrhages, which is often found in shaken or abused children. Tr. 402-403. The doctor testified the injuries RayVon had are typically seen in "very high impact injuries," such as high speed motor vehicle accidents or a child falling from a second story building onto concrete. Tr. 413. RayVon died at the hospital on the morning of Thursday, December 13, 2012.

**{¶8}** That afternoon, Appellant and Artist were interviewed by Detective Sergeant Patton. The detective specifically asked, "Has the baby fallen lately, hit his head?" 12/13/12 Interview State's Exhibit 8. Appellant responded saying RayVon might have hit his head on the wall Monday. 12/13/12 Interview State's Exhibit 8. He described it as bumping his head on the drywall by sitting back real hard. 12/13/12 Interview State's Exhibit 8. Appellant stated the toddler laughed after bumping his head. 12/13/12 Interview State's Exhibit 8.

**{¶9}** Artist told the detective Appellant informed her RayVon fell down a few steps on Monday. She testified she did not see the fall; she was at work.

{¶10} An autopsy was performed by the Summit County Coroner's Office. Following the examination, the Chief Medical Examiner Dr. George Sterbenz determined the cause of death was craniocerebral blunt force trauma, and the manner of death was homicide. State's Exhibit 21. He testified there were multiple impacts to the back of the head causing a skull fracture and brain injury. Tr. 473, 490, 495, 505. He avowed this type of injury would result in immediate disability and quick death. Tr. 499.

{¶11} Thereafter, Detective Patton asked the medical examiner if a fall down a couple of stairs could cause the injuries. He was told no, it could not happen from a fall. Tr. 385, 777.

{¶12} Appellant was indicted on May 9, 2013 for felony murder in violation of R.C. 2903.02(B)(D), an unclassified felony; child endangering in violation of R.C. 2919.22(B)(1)(E)(2)(d), a second-degree felony; and child endangering in violation of R.C. 2919.22(A)(E)(2)(c), a third-degree felony. Appellant pled not guilty.

{¶13} The case proceeded to a jury trial. The jury found Appellant guilty of all indicted charges. 6/29/15 Jury Verdict Forms; 7/7/15 J.E. For purposes of sentencing, the child endangering convictions were found to be allied offenses of similar import, and accordingly, merged with the felony murder conviction. 7/10/15 J.E. The trial court imposed the mandatory 15 years to life sentence for the felony murder conviction. 7/10/15 J.E.

{¶14} Appellant appeals from his conviction and sentence.

*First Assignment of Error: Due Process*

{¶15} Appellant's first assignment of error contends:

"Using child endangerment as a predicate offense for felony murder violates the due process clause of the U.S. Constitution."

{¶16} Appellant acknowledges that under the plain text of the felony murder statute, child endangering may serve as a predicate offense for felony murder. However, he contends allowing it to serve as a predicate offense violates due process because it relieves the state of proving the culpable mental state. In

asserting his argument, Appellant acknowledges multiple other appellate districts have disagreed with this argument.

{¶17} The state counters arguing this issue was not raised to the trial court and thus, is waived. Furthermore, it also cites to other appellate court decisions which have found no merit with the due process argument.

{¶18} The state's arguments are correct. Appellant did not raise the due process issue to the trial court. The failure to raise an issue in the trial court waives all but plain error on appeal. *State v. Lorraine*, 66 Ohio St.3d 414, 416, 613 N.E.2d 212 (1993). Regardless, even if the issue was not waived, it lacks merit.

{¶19} Appellant was convicted of felony murder in violation of R.C. 2903.02(B). That statute provides, "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." R.C. 2903.02(B). Appellant was found guilty of R.C. 2919.22(B)(1)(E)(d), second-degree felony child endangering. R.C. 2901.01(A)(9) defines an offense of violence to include a violation of R.C. 2919.22(B)(1). Consequently, child endangering can constitute the predicate offense for felony murder.

{¶20} Furthermore, R.C. 2903.02(B) has consistently been found to not violate due process rights. *State v. Hayden*, 11th Dist. No. 99–L–037, 2000 WL 973413 (July 14, 2000) (R.C. 2903.02[B] does not relieve the state of the burden of proving mens rea simply because the intent to kill is conclusively presumed so long as the state proves the required intent to commit the underlying felony); *State v. Pickett*, 1st Dist. No. C–000424, 2001 WL 1591318 (Dec. 14, 2001) (same); *State v. Collins*, 5th Dist. No.2003–CA–0073, 2005–Ohio–1642 (same); *State v. Minifee*, 8th Dist. No. 91017, 2009–Ohio–3089 (same); and *State v. Cherry*, 9th Dist. No. 20771, 2002–Ohio–3738 (same). "Thus, the mens rea element for felony murder under R.C. 2903.02(B) is satisfied when the state proves the intent required for the underlying felony." *State* v. *Maynard*, 10th Dist. Franklin No. 11AP–697, 2012–Ohio–2946, ¶ 17. *See also*, *Hayden*, *Pickett*, *Collins*, *Minifee* and *Cherry*. Id. at ¶ 23. "[T]he General

Assembly has chosen to define felony murder in this manner, and the General Assembly is presumed to know the consequences of its legislation." *State v. Miller*, 96 Ohio St.3d 384, 2002–Ohio–4931, ¶ 34.

{¶21} The Ninth Appellate District has specifically addressed the due process argument regarding felony murder and the predicate offense of child endangering. *Cherry*, 9th Dist. No. 20771, 2002–Ohio–3738, ¶ 34-44. Our sister district held due process rights were not violated and concluded a conviction for murder based on a predicate felony with a mens rea of "recklessly" does not violate constitutional rights. *Id.* at ¶ 39. It reasoned:

> R.C. 2903.02(B) evidences a clear legislative intent to subject those who commit the most serious felonies to liability for murder, where commission of those felonies results in death. Where commission of child endangering in violation of R.C. 2919.22(B)(1) results in serious physical harm to the child victim, the violation is a felony of the second degree and thereby becomes included in the class of eligible R.C. 2903.02(B) predicate felonies. R.C. 2919.22(E)(2)(d); R.C. 2903.02(B). The consequence of this statutory scheme is to subject one who causes serious physical harm to a child through an act of reckless abuse to prosecution for murder, where the death of the child is a proximate result of such abuse.

> In light of the legislature's clear desire to punish under R.C. 2903.02(B) those who proximately cause the death of children by acts of reckless abuse, we find no merit to Appellant's argument that his constitutional rights were violated by predicating his conviction on a felony with a mens rea of "recklessly."

*Id.* at ¶ 43-44.

{¶22} We agree. The due process argument raised in this assignment of error lacks merit. This assignment of error is meritless.

*Second Assignment of Error: Sufficiency*

**{¶23}** Appellant's second assignment of error contends:

"The State submitted insufficient evidence to support a conviction."

**{¶24}** Sufficiency of the evidence is a question of law dealing with legal adequacy of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). It is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In viewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A sufficiency review is distinct from an evaluation of the weight of the evidence which involves the persuasiveness of the evidence. *Thompkins*, 78 Ohio St.3d at 386. A conviction cannot be reversed on grounds of sufficiency unless the reviewing court determines that no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *Goff*, 82 Ohio St.3d at 138.

**{¶25}** As aforementioned, Appellant was convicted of felony murder, R.C. 2903.02(B), with child endangering, R.C. 2919.22(B)(1)(E)(2)(d), being the predicate offense. Felony murder, as defined by R.C. 2903.02(B), provides no person shall cause the death of another while committing a first or second-degree felony offense of violence. Child endangering as defined by R.C. 2919.22(B)(1) requires proof the offender abused a child under eighteen years of age. If the abuse results in serious physical harm to the child, the violation of R.C. 2919.22(B)(1) constitutes a second degree felony. R.C. 2919.22(E)(2)(d). Although not stated in the statute, the mens rea for endangering children is recklessness. *State v. Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 (1980), paragraph one of the syllabus. "Recklessness" is defined as a person who "with heedless indifference to the consequences, * * * disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

**{¶26}** Appellant contends the state did not offer facts demonstrating Appellant disregarded a known risk or abused the victim. He argues the facts of the case reveal the likelihood of the death being caused from a fall down a couple of steps. Furthermore, he asserts the state's theory is based on a res-ipsa-loquitur theory of liability; the toddler was in Appellant's care and therefore, the injuries are only attributable to Appellant.

**{¶27}** The state counters arguing it provided evidence of all elements of the offenses. It asserts it produced evidence Appellant abused the child, and the abuse was the proximate cause of death.

**{¶28}** The record indicates the state did provide evidence of all elements of the offenses. The autopsy report and testimony from Dr. George Sterbenz and Dr. Vivek Malhotra provided evidence of abuse and the manner of death.

**{¶29}** Dr. George Sterbenz performed the autopsy. The cause of death listed in the report was craniocerebral blunt force trauma and stated the manner of death was "Homicide: Struck by other person(s)." State's Exhibit 21. He stated RayVon suffered from "severe multiple concussive forces to the head with [sic] severe huge fracture to the back of his head with a fracture extended right next to the brain stem." Tr. 498. He explained there were multiple blows to the front of the head and multiple severe blows to the back of the head. Tr. 505. Because there were no abrasions on the skin, the doctor reasoned the multiple blows to the head were from a nonabrasive surface, such as a fist without jewelry or pieces of movable furniture. Tr. 508-509. According to Dr. Sterbenz, the type of injury the toddler sustained would result in immediate disability and quick death; the injury was not consistent with an accidental fall. Tr. 499, 505-506. In the doctor's opinion, the injury did not occur two days prior to death. Tr. 499. Rather, it occurred minutes to hours before the child's cardiorespiratory arrest. Tr. 509.

**{¶30}** Dr. Vivek Malhotra is a pediatric intensivist, works at the ICU at Akron Children's Hospital, and treated RayVon while he was at Akron Children's Hospital. Tr. 394, 396, 399-400. He stated he examined the toddler's eyes and there was evidence of bilateral extensive retinal hemorrhages. Tr. 402-403. He explained this

finding is typically seen when children are abused. Tr. 403. The hemorrhages are caused by the sheer force of shaking or hitting the child with a very blunt object. Tr. 404. He stated after a massive skull fracture, like the one in this case, the child would not be laughing. Tr. 435. The doctor was asked if there was a significant concern the toddler might have been abused. He responded yes and explained, "One, I could not explain from the history that I got from the father, who was watching this child, I could not get a[n] explanation as to why he had such severe swelling in the brain, blood in the brain, fracture of his brain. And, secondly, the retinal hemorrhages was my other concern that are very, very classic for patients who have child abuse." Tr. 419.

{¶31} Artist and Appellant's statements and testimony indicated Appellant was with the toddler on December 12, 2012. Tr. 795, 942-943; State's Exhibit 8.

{¶32} Although there are no eye witness accounts or statements as to what exactly caused RayVon's injuries, the above testimony provides sufficient evidence for the felony murder charge to go to the jury. It was undisputed the toddler was under eighteen years of age. It is also undisputed the toddler was solely in Appellant's care prior to death. When considering both Dr. Sterbenz and Dr. Malhotra's testimony there is evidence that within hours of the child's death, the child was abused, which resulted in serious physical harm to the child and ultimately death. The testimony also suggests Appellant acted recklessly in abusing and ultimately causing the child's death.

{¶33} Admittedly, Appellant asserts the injuries and death were not caused from abuse, but rather from falling down a couple of steps. For purposes of sufficiency his argument does not negate the testimony from Dr. Sterbenz and Dr. Malhotra. This argument is a manifest weight argument and is addressed in the next assignment of error.

{¶34} Thus, considering the state's evidence, there was sufficient evidence for the felony murder charge to go to the jury, and for it to decide whether the evidence proved beyond a reasonable doubt Appellant committed felony murder. This assignment of error is meritless.

*Third Assignment of Error: Manifest Weight*

{¶35} Appellant's third assignment of error provides:

"The jury returned a verdict against the manifest weight of the evidence."

{¶36} When reviewing a judgment under a criminal manifest weight standard of review, "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387. A reviewing court's discretionary power to reverse on manifest weight grounds and grant a new trial is exercised only in the exceptional case where the evidence weighs heavily against conviction. *Id.* This standard is a high one because the trier of fact is in the best position to determine credibility issues, by having personally viewed the demeanor, voice inflections, and gestures of the witnesses. *State v. Ali*, 154 Ohio App.3d 493, 2003–Ohio–5150, 797 N.E.2d 1019, ¶ 36 (7th Dist.).

{¶37} As stated above, Appellant contends he did not abuse the child; he did not hit the child with his fist or against furniture causing the craniocerebral blunt force trauma. He asserts the injury was caused by RayVon falling down a couple steps a few days prior to his death. Appellant presented testimony from a pediatric forensic pathologist and biomechanical engineer to support his position.

{¶38} According to Appellant, after taking the child home on Saturday night, Appellant gave RayVon a bath and put him to bed. Tr. 935. On Sunday, Appellant, Artist, and the two kids were at the house watching television. Tr. 935. On Monday, Appellant watched both RayVon and Artist's son. Appellant testified on Monday evening, while he was making dinner, RayVon was in the living room on the couch. Tr. 937. Appellant would check on the child every couple minutes and at one point RayVon was no longer on the couch but was lying on the landing of the steps. Tr. 937. These were steps for the second floor and the landing was located in the living room. Tr. 937. He avowed the child laughed and seemed okay. Tr. 937-938. Although he did not see the child fall or bump his head, Appellant checked him over,

and contacted Stewart, Artist, and his mom about the incident. Tr. 937-938. Appellant testified on Tuesday he took the child to his sister's house so he could go for a job interview. Tr. 940. He stated the child was sleeping a lot that day. Tr. 941. On Wednesday, Artist got the kids up around 10:00 a.m. because her son had a dentist appointment. Tr. 942. She took RayVon out of the crib he shared with her son, and walked him into her and Appellant's bedroom where he climbed into bed with Appellant and fell back asleep. Tr. 942. Appellant testified they woke up at noon. Tr. 942. The child had a sippy cup of milk and cereal bar and they watched a movie. Tr. 942. The child fell back asleep around 1 p.m., and Appellant put him back in the crib. Tr. 942. While the child was asleep Appellant took a shower and got dressed. He then heard RayVon "gasping," "taking deep breaths." Tr. 943. Appellant checked on the child, and the child was unresponsive. Tr. 943. Artist arrived at house and called 911. Tr. 943.

{¶39} The 911 call was played for the jury. Tr. 305. The 911 call was made at 3:04 p.m. on December 12, 2012. The operator instructed Artist on how to administer CPR. In the background one can hear Appellant say he already attempted CPR, and the child was not responding. The operator indicated an ambulance was in route. At 3:13 p.m. Artist called 911 again because the ambulance had not arrived. Shortly after that Officer Assad Chaibi arrived on the scene. Tr. 308.

{¶40} Officer Chaibi testified that when he arrived Appellant and Artist were outside and the toddler was lying on the couch. Tr. 312. He immediately started CPR and when the ambulance arrived, the paramedic, Kimberly Nosek, took over. Tr. 315, 330-331.

{¶41} As aforementioned, RayVon was taken to St. Elizabeth's Hospital in Youngstown and then flown to Akron Children's Hospital in Akron. The child died on December 13, 2012 at Akron Children's Hospital. Following the child's death, Appellant was interviewed by Detective Sergeant John Patton. Tr. 370-371. The interview was played for the jury. Tr. 375.

{¶42} During the interview Appellant was asked if RayVon had fallen or bumped his head. Appellant responded that on Monday or Tuesday the child had sat back "real hard" and bumped his head on a wall at the bottom of the steps. Appellant stated the wall was dry wall. He explained the child laughed after bumping his head and was alright. State's Exhibit No. 8. Appellant denied hitting the child. Tr. 388.

{¶43} Artist testified RayVon fell down the steps about two days before he died. Tr. 794. She did not see the fall; Appellant told her it happened. Tr. 794. She physically checked RayVon after she got home from work and he seemed fine. Tr. 804.

{¶44} Detective Sergeant Patton contacted Dr. Sterbenz, who performed the autopsy, and asked if a fall could have been the cause of death. Tr. 777. Dr. Sterbenz indicated the death could not have been caused from falling down steps. Tr. 777. Detective Sergeant Patton did not pursue the theory that the death was caused by an accidental fall because of the coroner's statement. Tr. 777.

{¶45} At trial, Dr. Janice Ophoven, a pediatric forensic pathologist, and Alan Dibb, a biomechanical engineer, testified for the defense. Considering RayVon's height and weight, Dibb was asked whether falling down a couple of steps could have caused the injuries RayVon sustained. Tr. 700. Biomechanical engineering applies the principles of mechanical engineering to determine how much force causes an injury to the human body. Tr. 699-700. He testified biomechanical studies have demonstrated the pediatric skull can fracture at impact heights around 32 inches onto carpeted and padded surfaces. Tr. 702. He opined, to a reasonable degree of scientific certainty, RayVon's injuries were consistent with "a mechanism of falling backwards and a direct impact to the back of the head." Tr. 708. On cross-examination, he admitted his opinion was based on the assumption RayVon was "standing on a couple of steps and fell backwards." Tr. 719. He made this assumption because no one saw the child fall.

{¶46} Dr. Janice Ophoven, based on Dibb's report, testified the skull fracture is consistent with a fall; "a fall from the stairs could have resulted in the skull fracture that ultimately lead to his cardiac arrest and death." Tr. 589, 600. She disagreed

with Dr. Sterbenz's conclusion that there were multiple impacts to the back of the skull. Tr. 634. She concluded a single impact caused the fracture; there was no evidence of multiple impacts. Tr. 634-635. She also disagreed with him about when the injury occurred in relation to death. She indicated it could have happened 48 to 72 hours prior to death. Tr. 640, 642-643. She testified given the brain swelling, there was survival for a period of time after the injury. Tr. 594. Children who are hurt and die immediately after do not have brain swelling because brain swelling occurs over time; brains of children who died immediately look perfect because there is no time for brain swelling. Tr. 594-595. She stated brain swelling peaks at 48 to 72 hours. Tr. 635. She likewise disagreed that retinal hemorrhaging was an indication RayVon was abused. Dr. Ophoven testified there could be at least five reasons why there was bilateral retinal hemorrhaging in this case. Tr. 598. One could be impact trauma, another could be brain swelling, a third could be a clotting abnormality, a fourth could be lack of oxygen, and a fifth could be CPR. Tr. 597-598. She indicated the bilateral retinal hemorrhaging has no value in interpreting what did or did not happen at the residence. Tr. 599. Given all the evidence, she opined RayVon was not abused and his death was caused by an fall down a couple of steps. Tr. 679, 681.

{¶47} Based upon the above, Appellant asserts the jury clearly lost its way when it found him guilty of felony murder because the evidence does not support such conclusion. The evidence, in his opinion, establishes RayVon died because of a fall down a couple of steps. He contends the testimony at least raises a reasonable doubt as to whether he abused RayVon and caused his death.

{¶48} The state, on the other hand, asserts the evidence indicates, beyond a reasonable doubt, Appellant abused RayVon and caused his death. As set forth in the second assignment of error, the state presented evidence from Dr. Sterbenz and Dr. Malhotra to support the position the child was abused and the abuse resulted in death. Both doctors described the injuries and provided reasoning for their conclusions. The pediatric intensivist, Dr. Malhotra, testified about RayVon's injuries and the indication of abuse, which were set forth above. He stated after a massive

skull fracture, like the one in this case, the child would not be laughing. Tr. 435. Dr. Sterbenz also described the injuries and concluded the type of injuries RayVon sustained would result in immediate disability and quick death; the injury did not occur two days prior to death. Tr. 499. He indicated there were multiple blows to the head and the injury was not consistent with an accidental fall. Tr. 505-506. In addition to the medical testimony, the state argued Appellant's demeanor and statements to police, the paramedic, and hospital personnel do not support the conclusion the injury was caused by a fall.

{¶49} Regarding Appellant's demeanor, witnesses testified Appellant was not emotional and did not seem concerned. Officer Chaibi indicated he found Appellant and Artist outside the house, while the child was laying on the couch and not breathing. Tr. 312. Officer Chaibi stated Appellant was not emotional or crying, and did not seem concerned. Tr. 315-316. Officer Chaibi described Appellant's demeanor as "another day at the office." Tr. 315. He stated, in his 18 years of experience, Appellant's demeanor was very odd considering the circumstances. Tr. 316-317. Kimberly Nosek, the paramedic, similarly testified Appellant seemed unattached to the situation. Tr. 330-331, 343.

{¶50} As to his statements to police, the paramedic, and hospital personal, he did not tell them of a fall, even when asked. Officer Chiabi testified Appellant did not tell him the child fell and/or hit his head. Tr. 318-319. Dr. Malhotra testified Appellant did not tell Akron Children's Hospital about RayVon falling and hitting his head. Tr. 412. Nosek, the paramedic, stated she asked if there was any trauma, such as the child being in a car accident, falling, or hitting his head. Tr. 344. Appellant denied any accident, falls, or hitting his head. Tr. 344. Furthermore, during his interview with Detective Sergeant Patton, when asked if RayVon had fallen or hit his head, Appellant did not state the child had fallen down the steps. Rather, he stated the child had bumped his head and described the event as RayVon sitting back "real hard" and hitting his head on the wall. State's Exhibit No. 8. The statement regarding the fall down the steps came from Artist, who did not see the fall, but said Appellant told her it happened.

**{¶51}** This case is a battle of the experts and doctors; each side presented a plausible theory. Appellant's experts asserted the evidence indicated RayVon's death was caused by falling down a couple steps two days prior to his death. One of Appellant's experts offered the opinion that RayVon was not abused. Conversely, the state presented evidence from two doctors that the injury occurred shortly before death and the evidence demonstrated RayVon was abused. The undisputed evidence indicated Appellant was the only person alone with the child shortly before death. We have recently explained circumstantial evidence that a person caused serious brain injuries to an infant can exist where the baby is alone with the defendant during the time when the injury was likely sustained. *State v. Lee*, 7th Dist. No. 14 Ma 120, 2016-Ohio-649, ¶ 50 (see string cite for other districts supporting such conclusion).

**{¶52}** Considering the two plausible theories, it was the jury's province to determine which evidence and experts to believe. The jury was in the best position to assess the credibility of witnesses and determine the weight to give to the evidence. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. There is no indication this case presents exceptional circumstances requiring our intervention in the fact-finder's weighing of the evidence. In resolving the conflicting expert opinions, we cannot conclude the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. This assignment of error is overruled.

*Fourth Assignment of Error – Cumulative Error*

**{¶53}** Appellant's fourth assignment of error provides:

"Multiple instances of error, if not reversible on their own, render this case reversible on a theory of cumulative error."

**{¶54}** Cumulative error exists only where the harmless errors during trial actually "deprive[d] a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. There is no such thing "as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." *State v. Hill*, 75 Ohio St.3d 195, 212, 661 N.E.2d 1068

(1996), quoting *United States v. Hasting*, 461 U.S. 499, 508–509, 103 S.Ct. 1974 (1983). To support a claim of cumulative error, there must be multiple instances of harmless error. *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

**{¶55}** Appellant references three harmless errors occurring during trial and argues these errors constituted cumulative error depriving him of a fair trial. The state disagrees and asserts Appellant has failed to show the alleged errors had the cumulative effect of depriving him of a fair trial.

**{¶56}** Two of the alleged errors Appellant references are about testimony of bruises on RayVon that occurred a week or so prior to his death. Prior to trial, Appellant filed a motion in limine; it was seeking to prevent the state from offering evidence about two alleged prior instances of Appellant causing injury or handling the child roughly. 1/22/15 Motion. The first instance occurred on November 30, 2012. There was a complaint from Stewart's neighbor that she saw a guy in a black car handle RayVon roughly by placing him in the car by his collar. 1/22/15 Motion. The second instance occurred sometime in late November or early December. 1/22/15 Motion. Stewart contacted police after RayVon came home from a visit with his father, and had scratches on his face, bruising on both sides of his face, and a split upper lip. 1/22/15 Motion. The case was referred to Children's Services on December 3, 2012. Over the state's objection, the trial court granted the motion in limine. 5/22/15 J.E.

**{¶57}** The state recalled two of its witnesses for rebuttal, Rhea Stewart and Dr. Sterbenz. Stewart was recalled to testify RayVon had a bruise on his face when he went to Appellant's house on December 8, 2012 and this was an older bruise. It was during this testimony that the alleged nonreversible harmless error occurred. Stewart was asked whether RayVon had any marks on him when he went to Appellant's home on December 8, 2012. Tr. 1008. She stated he had a mark on his face. Tr. 1008-1009. The state asked how long the child had the mark. Tr. 1009. Stewart replied, "maybe a couple days prior to me dropping him off." Tr. 1009. Instead of stopping at that point, the state then asked, "What about – since November 30, is that when that mark – came to fruition?" Tr. 1009. Stewart

responded yes. Tr. 1009. Appellant objected and moved for a mistrial arguing the ruling on the motion in limine prohibited the state from mentioning the November 30 date and referencing the alleged rough handling of RayVon. Tr. 1009-1013.

{¶58} The state alleged it was using the testimony to dispute Dr. Ophoven's testimony that the bruise was caused by resuscitation and was not an old bruise. Tr. 1010.

{¶59} Upon reviewing the testimony it becomes clear the state did not have to use the November 30 date to make its point. Stewart testified the bruise was there prior to her dropping off RayVon. This disputed Dr. Ophoven's testimony that the bruise probably happened during resuscitation. It also reinforced Dr. Sterbenz's testimony that the bruise was an old bruise; Stewart's testimony may have helped increase Dr. Sterbenz's credibility. The state did not need to mention November 30 to make its point. Thus, by asking about November 30 specifically, the state's line of questioning could be seen as an attempt to get the November 30 alleged instance of rough handling before the jury.

{¶60} The second alleged harmless error is referred by Appellant as "a children services' investigation referencing the 'victim and his family.'" Appellant does not cite to the transcript where the children services' investigation was referenced. However, it appears he is discussing Dr. Ophoven's testimony where the trial court determined she opened the door to reference the children services' investigation for purposes of attacking her credibility. Tr. 667-671. During her testimony she indicated there was no evidence the child was mishandled and that was something she considered in determining whether the death was caused by abuse or by an accidental fall. Tr. 646, 650. This testimony opened the door for questioning her on her knowledge of any prior mishandling incidents. Tr. 667.

{¶61} Dr. Ophoven testified she reviewed a police report from November 30, 2012 and was aware of another reported incident being investigated. Tr. 673-674. She stated it did not have anything to do with her evaluation. Tr. 674. The state then asked if this was another incident of abuse of RayVon by Appellant. Tr. 674. Appellant objected and the trial court sustained the objection. Tr. 674-675. The

testimony proceeded and Dr. Ophoven was asked about the bruises on RayVon's face and the children services' investigation regarding the bruises. Tr. 677. Dr. Ophoven then clarified her earlier testimony to explain there was "no evidence of rough handling at the time of the postmortem." Tr. 677. She indicated there was nothing to suggest the child had been abused when he came to the hospital. Tr. 677.

**{¶62}** The third alleged instance of harmless error concerned a conversation Appellant's relative initiated with two jurors. Tr. 836-891. Two jurors reported that while at lunch a relative of Appellant talked to them and told them, "My nephew is innocent. We are churchgoing people." Tr. 839, 854. They responded "thank you" and we cannot talk to you. Tr. 839, 854. Both jurors testified the relative started the conversation and they both had their juror tags visible. Tr. 839, 854. The alternative juror joined them after the conversation and they told him about the discussion. Tr. 844, 859. After questioning by the trial court, the state, and defense counsel, all three jurors indicated the conversation did not affect them and did not impact their ability to make a fair decision. Tr. 848-849, 859, 870-871.

**{¶63}** Appellant made no objection to the trial going forward; and, in fact, he stated he wanted it to go forward. Tr. 881.

**{¶64}** Considering all three instances in conjunction with each other, this court concludes there is no reversible cumulative error. The reference to the children services investigation in Dr. Ophoven's testimony was not error. The door was opened by Dr. Ophoven. Any statements regarding prior abuse were objected to, and a response to the question was not permitted. Furthermore, the issue regarding the conversation with the jurors did not warrant the trial court granting a mistrial sua sponte. The jurors indicated they could decide the case fairly. Furthermore, Appellant clearly indicated he wanted the trial to go forward. Potentially harmless error occurred during Stewart's rebuttal testimony as it related to the November 30 date. However, one instance of harmless error does not amount to cumulative error.

**{¶65}** For those reasons, this assignment of error lacks merit.

*Conclusion*

**{¶66}** All assignments of error lack merit.  The conviction and sentence are affirmed.

Donofrio, J., concurs.

DeGenaro, J., concurs.