[Cite as *State v. Thompson*, 2017-Ohio-9044.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 16 CO 0031 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| JASON M. THOMPSON, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:      Criminal Appeal from the Court of
                               Common Pleas of Columbiana County,
                               Ohio.
                               Case No. 2015 CR 414

JUDGMENT:                      Affirmed.

APPEARANCES:

For Plaintiff-Appellee:        Atty Timothy McNicol
                               Columbiana County Prosecutor's
                               Office
                               105 S. Market St.
                               Lisbon, Ohio 44432

For Defendant-Appellant:       Atty Ronald D. Yarwood
                               Edward A. Czopur
                               DeGenova & Yarwood, Ltd.
                               42 North Phelps St.
                               Youngstown, Ohio 44503

JUDGES:

Hon. Carol Ann Robb
Hon. Gene Donofrio
Hon. Mary DeGenaro

                               Dated: December 13, 2017

ROBB, P.J.

**{¶1}** Defendant-Appellant Jason Michael Thompson appeals from his child endangering convictions entered in the Columbiana County Common Pleas Court after a bench trial. As to the abuse counts, he contends the indictment was required to specify the affirmative act of abuse he allegedly committed and the evidence was insufficient to prove an affirmative act of abuse. As to the alternative counts involving violation of a duty, he raises sufficiency and weight of the evidence as to whether he had an "in loco parentis" relationship with the children. For the following reasons, the trial court's judgment is affirmed.

STATEMENT OF THE CASE

**{¶2}** Appellant met Jaime Emery ("the mother") online in January 2015. At the time, the mother lived with her daughter and three sons at a relative's residence. She and her four children moved to the first floor of a rental unit in Wellsville. At first, Appellant lived in Pennsylvania and would visit the mother for days at a time. Eventually, he began living with the mother and visiting his teenage son in Pennsylvania. Appellant considered the mother to be his fiancée, and the children called Appellant "dad." (Tr. 30, 74, 101).

**{¶3}** Appellant obtained latches and key locks and convinced the maintenance person, who lived in the upstairs unit, to help him install the latches on the refrigerator and freezer. (Tr. 280-281). He told the maintenance man the children were getting into the refrigerator in the middle of the night and leaving the door open. (Tr. 281). The maintenance person testified this occurred at a time when there was still snow on the ground. (Tr. 280). He considered Appellant his neighbor and said Appellant lived at the rental unit with the mother and her children. (Tr. 286).

**{¶4}** At the beginning of 2015, a middle school teacher and the school superintendent noticed the ten-year-old child ("Child A") was often hungry. (Tr. 27, 40, 135). The school provided a free daily breakfast, lunch, and snack. Child A would eat his classmates' leftover breakfast items. (Tr. 27). Appellant attended a school meeting with the mother in March 2015, where they were informed of the

school's concern about Child A's hunger. (Tr. 28-30). Appellant responded that Child A was a growing boy, and the mother did not comment. (Tr. 29-30, 56).

{¶5} At the end of the school year, Child A's teacher did not notice any issue with his appearance. An elementary school teacher noticed the eight-year-old child ("Child B") had "thinned out" but believed this was normal for a second-grader and was not concerned with his appearance as the school year ended. (Tr. 65-66). Around this time, the female child (who is not involved in the allegations at issue) was placed in foster care for an unrelated matter.

{¶6} The school held a back-to-school function on Wednesday, August 26, 2015, where free supplies were distributed. Appellant attended with the mother and her three sons. Child A had turned eleven over the summer. Child A and Child B were to start school on Monday, and the seven-year-old child (Child C") was to begin kindergarten on Tuesday. Child A and Child B were assigned to the same teachers as they had the prior year as they each had an individualized education plan ("IEP") calling for special education in the disability classroom.

{¶7} Child A's teacher approached the family at the prompting of her teacher's aide. She said Child A did not communicate with her in his normal manner but mumbled and stared ahead. (Tr. 35). The teacher was shocked by the appearance of the three boys, testifying: "My first thought was remembering documentaries I had saw of people who had survived concentration camps and just the appearance of them physically." (Tr. 34-35). She said their bones were very prominent and they had dark circles under their eyes. She described the two younger children as "skeletal-looking" as it appeared their skin was "clinging to their bones basically." (Tr. 35).

{¶8} When Child B's teacher approached the family, she focused on Child B as he was her student. She too referred to a "concentration camp" when describing the child's appearance. She said Child B's cheekbones were "standing out" and you could see his bones through his skin. His face looked long because it was "all sunken in." (Tr. 69). The tops of his arms were thin, and she could tell he suffered "extreme weight loss." (Tr. 69-70).

**{¶9}** A teacher's aide hugged Child B and testified his arms felt like "two little chicken bones." He appeared weak and did not act like himself. (Tr. 112). The teacher's aide asked if he had been sick as she believed he looked like he had received chemotherapy; she was crying as she left the family. (Tr. 93, 112).

**{¶10}** The two teachers and their two aides approached the elementary school principal. The decision was made to send the children to the school nurse when school started on Monday and to contact the police immediately as they were worried about the difference those five days could make.

**{¶11}** A police officer went to the house and conducted a welfare check. He noticed latches but no locks on the doors of the refrigerator and freezer which he described as fully stocked. (Tr. 194-195). The mother told the officer the two older children's Adderall prescription for attention-deficit/hyperactivity disorder ("ADHD") caused their appearance. (Tr. 194). The police contacted Columbiana County Children Services. The next day, the caseworker assigned to the daughter's case went to the residence, but no one was home. She texted the mother and instructed her not to lock the refrigerator. (Tr. 147).

**{¶12}** On the first day of school, August 31, 2015, Child B looked to be better hydrated as his cheeks did not appear so sunken. (Tr. 96). He was hungry that day and ate two breakfasts, lunch, and multiple snacks. (Tr. 120). The teacher's aide brought Child B to the nurse's office when the police lieutenant assigned to juvenile cases arrived. Child B said he had been eating only once a day at dinner. (Tr. 97, 208). He said he liked milk but was not allowed to drink it as the milk belonged to his parents. (Tr. 97).

**{¶13}** The lieutenant took photographs of Child B with his shirt pulled up and then went to the middle school to take photographs of Child A. (State's Exhibit 1-5). Child A's teacher noticed he was quiet and did not interact as usual. He still had dark circles under his eyes. (Tr. 38). The school superintendent testified Child A looked gaunt and the area below his cheeks appeared "sucked" in. (Tr. 130). Child A reported he received only one meal a day and sometimes, if he misbehaved, he received nothing to eat. (Tr. 209).

**{¶14}** Children Services obtained an emergency court order, and the children were removed from the house after school. Before being transported to the local hospital, the children were provided with fast food as they were hungry. (Tr. 150). They also ate a plethora of food at the hospital, so much that Child B vomited upon arrival at the foster home. (Tr. 150-151).

**{¶15}** The next day, September 1, 2015, the children were transported to the Children's Advocacy Center ("CAC") in Boardman for evaluation by a pediatric physician who specialized in child abuse. The children were interviewed for the physician by a licensed social worker as is standard procedure at the CAC. (Tr. 296).

**{¶16}** During the interview, Child A reported that after Appellant came into their lives, their food situation changed from three meals a day to "one meal a day and two meals sometimes." A meal would consist of a bun with one piece of lunchmeat or a bowl of spaghetti. If he asked for food during the day, he was told to wait for dinner; if he asked for more food at dinner, Appellant and his mother told him he had to wait for the next day. (Tr. 298). Before Appellant came into their lives, the children could ask for and receive additional food. (Tr. 298, 303). Child A reported there was additional food in the house but he did not get to eat it because Appellant says he eats "like a pig" and "says I got to starve." (Tr. 298). The children's meals were served on the floor in the living room. (Tr. 302). Child A said his mother and Appellant would eat wings and French fries but not share with the children. (Tr. 302-303). Child A disclosed he was locked in his room at night and there was a latch and key lock on the refrigerator. He said the children frequently got in trouble for getting into the food. (Tr. 301).

**{¶17}** At trial, Child A testified that when Appellant lived with them, he would eat one meal a day at supper and sometimes he would get lunch as well. (Tr. 240, 251). He said Appellant and his mother prepared the food together. (Tr. 254). A typical meal was "sauce and noodles" or a sandwich but never at the same time. (Tr. 240, 254). He testified Appellant put a lock on the children's bedroom door so they could not get to the refrigerator. (Tr. 241). He confirmed Appellant put locks on the refrigerator so the children could not get into it at night or during the day. (Tr. 240-

241, 247-248).  Child A told a story about Child C fitting through a vent to escape their bedroom into the adults' bedroom, scavenging for food from the kitchen (including from the garbage can), and then bringing some bread back to the room through the vent.  (Tr. 242, 250).

{¶18} The physician from CAC testified the three children suffered from food deprivation.  (Tr. 307, 311, 316).  He described the following weight loss:  Child A weighed 80 pounds on January 1, 2015 and less than 67 pounds on September 1, 2015; Child B weighed 53 pounds on April 2, 2015 and less than 45 pounds on September 1, 2015; and Child C lost 3.3 pounds during the same period.  (We note the ending weights were taken a day after the children had been amply fed by the school, an agency worker, the hospital, and the foster parents.)

{¶19} The physician identified photographs taken at the CAC which showed some of the symptoms of food deprivation he identified.  As for Child A, he had very prominent scapula, his spine was visible while standing straight up, and his buttocks were not as full as they would be in a child who is a healthy weight.  (Tr. 305). Child C had prominent scapula, visible ribs, and hollowed buttocks, but he seemed to have suffered a lesser amount of food deprivation.  (Tr. 309, 311).

{¶20} Child B was the most severe of the three children.  (Tr. 314).  The physician stated the child looked acutely ill, with a sallow and narrow face.  (Tr. 315). Child B had prominent scapula, ribs showing through his skin, and vertebral processes so visible that they could be individually counted, which the doctor could not recall seeing in a healthy child.  (Tr. 315, 317, 323).  The hollowness of this child's buttocks was extremely noticeable in the photograph; the physician explained this was a very abnormal sign and a strong indicator of food deprivation.  (Tr. 323).

{¶21} The physician instructed the foster parents to offer an array of healthy foods and allow the children to eat what they wanted from the array.  (Tr. 307, 312). In the next two weeks, the children gained weight in the following approximate amounts:  Child A gained 3.09 pounds; Child B gained 4.63 pounds; and Child C gained 3.3 pounds.  (Tr. 308, 312, 316).  This fast weight gain by previously underfed children is known as the "catch-up growth" phenomenon.  (Tr. 312).  The

photographs taken at the September 15, 2015 visit to CAC show the children looking better with a less prominent display of bones. The hollows in the buttocks of Child A were resolved. (Tr. 309). The buttocks of Child B "still show depression, still show evidence of caloric deprivation, but they're not sagging" as they were in the photograph from two weeks earlier. (Tr. 317).

{¶22} The physician acknowledged the children's ADHD medication could cause weight loss in the first year. He said the records suggested that any such medication-induced weight dip already occurred in the first year they took the medication and they had rebounded before the summer of food deprivation. (Tr. 318-319). He also noted he could not rule out malnutrition as the cause of their prior weight dip. (Tr. 337). He said the expected weight loss from the medication is not usually to the extent seen here and it would be very unusual to see a second weight dip from the medication. Additionally, if the medication was the cause and food deprivation was not the cause, the weight loss would have persisted in the new foster environment where the children had access to adequate food. (Tr. 319). There was testimony the children required counseling due to food hoarding behavior in foster care which was said to be a result of emotional insecurity about food availability induced by the food deprivation. (Tr. 184-185, 319-320).

{¶23} After the children's removal, the mother was arrested for child endangering. Photographs were taken showing the latches on the refrigerator (the locks had been removed) and the contents of the refrigerator, which included food and alcoholic beverages. Appellant went to the police station to be interviewed on September 3, 2015, and his statement was admitted at trial.

{¶24} Appellant reported he did not work and was trying to receive disability for his kidney disease. (Int.Tr. 7). He received $357 per month in food stamps from Pennsylvania; he had a teenage child who lived in Pennsylvania with Appellant's father and three other children with whom he did not communicate. (Int.Tr. 3, 21). The mother received $430 per month in food stamps until her daughter was removed in June 2015, at which point her amount was decreased to $360 per month. (Int.Tr. 21-22). Appellant said he used his food stamps to help the mother and there was

always sufficient food in the house. (Int.Tr. 21-22). There was also testimony at trial the mother received $1,466 per month in SSI ("Supplemental Security Income") for the two older boys. (Tr. 170).

{¶25} Appellant stated he did not move in to the mother's house full-time but stayed at the house most of August and would occasionally drive to Pennsylvania to visit this family. (Int.Tr. 6-7). He acknowledged the children called him dad and they had not seen their biological father since the month he met their mother. (Int.Tr. 11, 24). When the children did not listen to their mother, he would talk to them and calm them down. (Int.Tr. 9). He imposed time-out when they misbehaved. (Int.Tr. 10). He and the mother both took the children to the park and to the lake to swim. When the children went outside, he helped watch them. The children were only allowed to play outside two or three times in August as Appellant believed it was too hot (which he attributed to medications he took). (Int.Tr. 12-13). Appellant went to medical appointments with the children. (Int.Tr. 41-41). When asked who was the primary caregiver or who was responsible for the care and control of the children (such as waking the children and getting them ready), his answer indicated they both fulfilled these roles. (Int.Tr. 15). They brought the children to school in the morning, picked them up in the afternoon, and helped them with their homework. (Int.Tr. 16-18).

{¶26} Appellant disclosed he normally cooked dinner for the family and the mother helped him serve the meals. (Int.Tr. 18-19). He claimed the children were allowed to have second helpings if they had leftover food, but sometimes they saved the leftovers for the next day. (Int.Tr. 19-20). Appellant admitted the children were not permitted to have an afternoon snack, contending it ruined their appetite for dinner. (Int.Tr. 23). If their behavior was bad, they would not get an after-dinner snack in the evening. (Int.Tr. 24, 30). Child C (whom the physician said suffered the least) was the child most likely to get a snack as he was the best behaved. (Int.Tr. 29). The children liked cereal, but if they did not awaken before 9:00 or 9:30 a.m. in the summer, Appellant would not allow them to eat breakfast, asserting it was too close to lunch time. (Int.Tr. 25-26).

**{¶27}** Appellant described the children's lunch as canned pasta rings, noodles with broth, leftovers, or a lunch meat and cheese sandwich. (Int.Tr. 26-27, 31). He said they were served water to drink as they asked for it but claimed they could have milk if they asked. (Int.Tr. 57-58, 63). Appellant reported he never denied the children lunch or supper. He admitted he would threaten food deprivation as punishment but said he never followed through on the threat. (Int.Tr. 49). Appellant noted he often ate only one meal a day (dinner) as he does not eat much. (Int.Tr. 27). He said, ever since he was a child, he would get sick if he ate breakfast. (Int.Tr. 49). He also revealed his childhood caregivers threatened to withhold food from him as punishment but still gave him food, which caused him to learn he would still get food even if he did not behave and which made his behavior worse. (Int.Tr. 59).

**{¶28}** Appellant claimed he had a hard time getting the mother to eat as she slept and rested often since her daughter was removed from the house. (Int.Tr. 28, 40, 48). He noticed Child B suddenly looked thin after being sick recently. (Int.Tr. 44-46). They brought the children to an all-you-can-eat buffet the weekend before school started (which was after the teacher's aide asked if they had been sick). (Int.Tr. 32-33). This was their only meal that day. (Int.Tr. 33).

**{¶29}** Appellant claimed he installed the latches on the refrigerator and freezer because the doors would not stay shut when they purchased too many groceries; he professed he did not use locks through the latches. (Int.Tr. 52). He complained the children "would get up in the middle of the night and just go out and do, get in to whatever they wanted to." He acknowledged the children had a lock on their bedroom door until "we was explained to why we couldn't do it and then we removed 'em and Children Services gave us alarms to put on the door." (Int.Tr. 55). (A caseworker testified alarms were provided years before when one of the children walked outside in the night as a toddler.)

**{¶30}** After Appellant's interview, a child endangering complaint was filed against him. He was thereafter indicted on six counts of child endangering; two types of child endangering were charged as to each of the three children. The first three counts charged child endangering under R.C. 2919.22(A), which prohibits a person

who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under 18 years of age from recklessly creating a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. These offenses were third-degree felonies due to the allegations of serious physical harm. The next three counts charged child endangering under R.C. 2919.22(B)(1), which prohibits any person from recklessly abusing a child who is under 18 years of age. These offenses were second-degree felonies due to the allegations of serious physical harm.

{¶31} A bench trial was conducted October 11-12, 2016. The trial court found Appellant guilty as charged, explaining the verdict in an October 21, 2016 decision. The state elected to proceed on the three second-degree felonies at sentencing, and the three other counts were merged. The court's November 7, 2016 sentencing entry imposed five years for the count involving Child B, four years for the count involving Child A, and four years for the count involving Child C to run consecutively for a total of 13 years in prison. The within appeal followed.

ASSIGNMENT OF ERROR ONE: SUFFICIENCY OF INDICTMENT

{¶32} Appellant sets forth four assignments of error, the first of which alleges:

"The indictment for the charges pursuant to R.C. 2919.22(B)(1) was defective insomuch as it failed to allege an affirmative act in violation of Appellant's due process rights and rights pursuant to Section 10, Article I of the Ohio Constitution and 6th and 14th Amendments to the United States Constitution."

{¶33} This assignment of error deals only with the three second-degree felony counts of child endangering under R.C. 2919.22(B)(1), which provides: "No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age: (1) Abuse the child; * * *." *See also* R.C. 2919.22(E)(2)(d) (if the violation of division (B)(1) results in serious physical harm to the child, the offense is a felony of the second degree).

{¶34} The indictment reads as follows as to each child: "On or about the summer months of 2015, in Columbiana County, Ohio, [Appellant] did recklessly abuse [child's initials], a child under 18 years of age, when such abuse resulted in

[child's initials] suffering serious physical harm; in violation of Section 2919.22(B)(1) of the Ohio Revised Code, being a felony of the second degree."

**{¶35}** Appellant contends the indictment is deficient for failing to specify the conduct resulting in the abuse allegations. He urges the act upon which the abuse element was based was an essential element of a child endangering offense charged under R.C. 2919.22(B)(1). He posits he did not waive the issue by failing to object below because the deficiency constitutes a structural error which is per se prejudicial, citing *State v. Colon*, 118 Ohio St.3d 26, 885 N.E.2d 917, 2008-Ohio-1624 ("*Colon I*"). To show the alleged error permeated the criminal proceeding under *Colon*, Appellant suggests the defect in the indictment was not mitigated by the bill of particulars as it also failed to specify an affirmative act of abuse. The bill of particulars referred to the failure to provide sufficient and appropriate nutrition, which conduct Appellant claims (under the next assignment of error) is an omission and insufficient to prove abuse.[1]

**{¶36}** We begin by reviewing why Appellant's citation to *Colon* is inappropriate. In *Colon I*, the Supreme Court held an indictment was defective where it failed to provide a mens rea, an essential element of the offense, even though the mens rea was not specified in the statute defining the offense. *Id.* at ¶ 19. The *Colon I* Court then found the defendant did not waive the defect in the indictment by failing to raise the issue at trial and the issue was a structural error which permeated the entire criminal proceeding and was per se prejudicial. *Id.* at ¶ 23, 32. In finding the error permeated the proceeding, the Court found: there was no evidence the defendant had notice the state was required to prove he had been reckless; the state did not argue the defendant's conduct was reckless; the jury instructions did not include the mens rea; and the prosecutor's closing argument treated the offense as

---

[1] Note Appellant does not argue an insufficient bill of particulars alone requires reversal. If a defendant seeks reversal of his conviction due to a lacking bill of particulars, he must show his defense was prejudice by a lack of knowledge of facts which should have been included in the bill of particulars. *State v. Chinn*, 85 Ohio St.3d 548, 569, 709 N.E.2d 1166 (1999). Also note a bill of particulars is not designed to provide the accused with specifications of evidence or to serve as a substitute for discovery. *State v. Sellards*, 17 Ohio St.3d 169, 171, 478 N.E.2d 781 (1985).

one of strict liability.  *Id.* at ¶ 30-31.

**{¶37}** On reconsideration, the Supreme Court limited *Colon I* to the "rare" facts and held:  "In a defective-indictment case that does not result in multiple errors that are inextricably linked to the flawed indictment such as those that occurred in *Colon I*, structural-error analysis would not be appropriate."  *State v. Colon*, 119 Ohio St.3d 204, 2008-Ohio-3749, 893 N.E.2d 169, ¶ 7-8 (typically "when a defendant fails to object to an indictment that is defective because the indictment did not include an essential element of the charged offense, a plain-error analysis is appropriate.").

**{¶38}** As in the case at bar, the "catchall culpable mental state" of recklessness applied.  R.C. 2901.21(C)(1) provides:  "When language defining an element of an offense that is related to knowledge or intent or to which mens rea could fairly be applied neither specifies culpability nor plainly indicates a purpose to impose strict liability, the element of the offense is established only if a person acts recklessly."  *See id.* at ¶ 12-14, citing former R.C. 2901.21(B).  *See also State v. Dawson*, 7th Dist. No. 15 MA 0118, 2017-Ohio-2957, ¶ 25, citing *State v. Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 (1980), paragraph one of the syllabus.  Unlike the *Colon* indictment, the indictment in the case before us did charge recklessness as the applicable mental state.

**{¶39}** Regardless, *Colon I* was overruled, and *Colon II* was overruled to the extent it held an indictment is defective when it omits the mental state even though it tracks the language of the statute.  *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 45.  The *Horner* Court held:  "When an indictment fails to charge a mens rea element of the crime, but tracks the language of the criminal statute describing the offense, the indictment provides the defendant with adequate notice of the charges against him and is, therefore, not defective."  *Id.  "[A]n indictment that charges an offense by tracking the language of the criminal statute is not defective* for failure to identify a culpable mental state when the statute itself fails to specify a mental state."  (Emphasis added.)  *Id.* at ¶ 54.

**{¶40}** Furthermore, the *Horner* Court held the failure to timely object to a defect in an indictment waives the error.  *Id.* at ¶ 46, citing Crim.R. 12(C)(2).

Pursuant to Crim.R. 12(C)(2), "Defenses and objections based on defects in the indictment, information, or complaint (other than failure to show jurisdiction in the court or to charge an offense, which objections shall be noticed by the court at any time during the pendency of the proceeding)[.]" Without a timely objection, the defendant is limited to a plain error review on appeal, as opposed to a structural error analysis. *Horner*, 126 Ohio St.3d 466 at ¶ 46. Upon such review, a bill of particulars can mitigate the effect of an omission in an indictment. *See, e.g., State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 137-138 (2014) ("The state provided a detailed bill of particulars that set out the location of the offenses. Thus, no plain error exists as to any of these counts."). However, the reviewing court does not consider prejudice if the indictment was not defective in the first place.

**{¶41}** Article I, Section 10, of the Ohio Constitution guarantees that "no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury." An indictment shall contain "a statement that the defendant has committed a public offense specified in the indictment." Crim.R. 7(B). "The statement may be made in ordinary and concise language without technical averments or allegations not essential to be proved. The statement may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in words sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged." *Id.*

**{¶42}** "Generally, the requirements of an indictment may be met by reciting the language of the criminal statute." *State v. Childs*, 88 Ohio St.3d 194, 199, 724 N.E.2d 781 (2000), citing *State v. Murphy*, 65 Ohio St.3d 554, 583, 605 N.E.2d 884 (1992) (an indictment that otherwise tracks the statutory language is not defective for failing to identify the elements of a predicate offense; an indictment for aggravated murder is not defective for failing to name the elements of the predicate offenses of aggravated robbery and aggravated burglary). The *Childs* court then found an indictment charging conspiracy was insufficient where it alleged the defendant committed a substantial overt act but failed to explain what the act was. *Childs*, 88 Ohio St.3d at 197-199.

{¶43} However, *Childs* is limited to conspiracy cases and can be extended only to offenses involving equivalent statutory language. The conspiracy statute, R.C. 2923.01(B), specifically requires a substantial overt act in furtherance of the conspiracy to be "alleged and proved." *Id.* at 199. The Court found this plain language requires an indictment for conspiracy to contain more than a mere recitation of the exact wording of the statute defining the offense * * *." *Id.* at 199.

{¶44} In contrast to the conspiracy statute at issue in *Childs*, the child endangering statute does not require the specific act of abuse to be set forth in the indictment. Appellant contends the indictment failed to charge an actus reus; however, the statute defining the offense provides "abuse" is the actus reus element of this type of child endangering. Essentially, Appellant is arguing the indictment was required to specify how he abused the child.[2] However, this is not the function of the indictment. The indictment tracked the language of the statute defining the offense, alleging Appellant abused a child under the age of 18. (In addition, the indictment provided the mens rea of recklessness; although, this is no longer an absolute requirement.) As the indictment contained the necessary elements and the statute defining the offense does not add a requirement that the state must allege the particular act of abuse, the indictment for child endangering under R.C. 2919.22(B)(1) was not defective. This assignment of error is overruled.

ASSIGNMENT OF ERROR TWO: SUFFICIENT EVIDENCE OF ABUSE

{¶45} Appellant's second assignment of error contends:

"The State failed to present sufficient evidence to support the convictions pursuant to R.C. 2919.22(B)(1) as it failed to prove an affirmative act thereby requiring reversal."

{¶46} Sufficiency of the evidence is a question of law dealing with the legal adequacy of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). A sufficiency review is distinct from an evaluation of the weight of the evidence which reviews the persuasiveness of the evidence. *Id.* at 386-387. A

---

[2] Notably, Appellant does not contend the indictment for the other type of child endangering charge, under R.C. 2919.22(A), was required to specify what duty of care he violated or how he violated it.

conviction cannot be reversed on grounds of sufficiency unless the reviewing court determines that no rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt upon evaluating the evidence in the light most favorable to the prosecution. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998).

**{¶47}** Like the first assignment of error, this assignment of error deals only with the three second-degree felony counts of child endangering under R.C. 2919.22(B)(1). Again, this division provides: "No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age: (1) Abuse the child; * * * *." R.C. 2919.22(B)(1). *See also* R.C. 2919.22(E)(2)(d) (the offense is a felony of the second degree if the violation of division (B)(1) results in serious physical harm to the child).

**{¶48}** Appellant challenges only the "abuse" element. He begins by asserting abuse requires an act as opposed to an omission, in other words an affirmative act. By way of comparison, he points to the merged child endangering counts filed under R.C. 2919.22(A), which involves a certain class of person (e.g., parent or person in loco parentis, as opposed to any person) creating a substantial risk to the health or safety of the child by violating a duty of care, protection, or support. Appellant points to the Supreme Court's comparison of the statute's divisions while the Court was addressing an issue raised under division (A):

> It is not necessary to show an actual instance or pattern of physical abuse on the part of the accused in order to justify a conviction under R.C. 2919.22(A). Affirmative acts of torture, abuse, and excessive acts of corporal punishment or disciplinary measures are expressly covered under division (B) of the section. Division (A) is concerned with circumstances of neglect as is indicated by the Committee Comment to R.C. 2912.22.[2] Manifestly, such neglect is characterized by acts of omission rather than acts of commission. *See, e.g., State v. Sammons* (1979), 58 Ohio St.2d 460, 391 N.E.2d 713. Accordingly, an inexcusable failure to act in discharge of one's duty to protect a child

> where such failure to act results in a substantial risk to the child's health or safety is an offense under R.C. 2919.22(A).

*State v. Kamel*, 12 Ohio St.3d 306, 308-09, 466 N.E.2d 860 (1984). The Supreme Court's footnote within the above block quotation provides in pertinent part: "The first part of the section defines the offense of neglect as the violation of a duty of care, protection, or support of a child which results in a substantial risk to his health or safety." *Id.* at fn. 2, citing Committee Comment to R.C. 2919.22(A).

{¶49} As to division (B), the legislative commentary explains how this division "deals with actual physical abuse of a child, whether through physical cruelty or through improper discipline or restraint, and regardless of by whom the offense is committed." *See, e.g., State v. Mabrey*, 8th Dist. No. 96048, 2011-Ohio-3849, ¶11, citing Legislative Service Commission Comment to R.C. 2919.22(B). This Comment further states: "Examples of violations include: various actions resulting in the "battered child syndrome;" reducing a child to a state of frightened withdrawal to the point where he may become incapable of normal learning because of repeated punishment inflicted with little or no cause; and *chaining a child to his bed or locking him in his room for prolonged periods so as to endanger his sanity or risk his arrested development.*" (Emphasis added.) Legislative Service Commission Comment to R.C. 2919.22(B).

{¶50} The state cites Ohio Jury Instruction 591.22(5), which defines abuse as "any *act* that causes physical or mental injury that harms or threatens to harm the child's health or welfare." (Emphasis added). Courts regularly refer to the abuse element of child endangering under R.C. 2919.22(B)(1) as "an affirmative act of abuse." *State v. Adkins*, 4th Dist. No. 14CA3674, 2016-Ohio-7250, ¶ 17; *Mabrey*, 8th Dist. No. 96048 at ¶ 8; *State v. Carse*, 10th Dist. No. 09AP-932, 2010-Ohio-4513, ¶ 40; *State v. Burdine-Justice*, 125 Ohio App.3d 707, 713, 709 N.E.2d 551 (12th Dist.1998); *State v. Bogan*, 2d Dist. No. 11920 (June 14, 1990).

{¶51} Appellant notes how the prosecution, in *Mabrey*, argued an affirmative act of abuse was not required to show child endangering under R.C. 2919.22(B) but the Eighth District disagreed and concluded an affirmative act was required to show

abuse. *See id.* at ¶ 9, 13. Nevertheless, the court found there was sufficient evidence showing an affirmative act of abuse was committed when the caretaker put the disabled five-year-old in cool water and failed to adequately supervise him while the child added cold water and suffered life-threatening hypothermia. *Id.* at ¶ 13-36. The appellate court found the defendant "acted recklessly in failing to adequately supervise [the child] while he played with the bathtub's water faucet handles" and it was "abusive to sit and watch a child freeze". *Id.* at ¶ 34. We note "[t]he State's trial theory was that Mabrey used a cold water bath abusively or to punish the child." *Id.* at ¶ 27.

{¶52} In the case at bar, it is not disputed there was evidence from which a reasonable person could conclude the children suffered severely from food deprivation which was attributable in part to Appellant and his rules and decisions. *See* Statement of the Case. Child A reported he had one meal a day and sometimes two meals per day. The meals prepared by Appellant were not substantial or adequate. The state construes Appellant's statement that he would not let the children eat breakfast if they woke up late as an admission that he punished the children by withholding breakfast. Appellant also admitted he withheld after-dinner snacks as a form of discipline. The children's bodies showed evidence that the meals provided were insufficient, which was confirmed by their weight gain after removal from the house.

{¶53} Appellant concludes the evidence of food deprivation (and the resulting serious physical harm) does not satisfy the abuse element of division (B)(1) and only constitutes an offense under division (A) of R.C. 2919.22 (if he occupied a required relationship to the children under assignments of error three and four). Appellant posits food deprivation can be an omission and neglect but is not an affirmative act of abuse.

{¶54} The state responds by pointing to Appellant's affirmative acts of "actively preventing" the children from eating. Besides the regular food deprivation and the serving of inadequate meals, which caused the children to show noticeable effects of food deprivation, Appellant actively engaged in preventative measures to

enforce his vision of the children's meal plan. The children reported they would get in trouble if they got into the food. Appellant locked the children in their room, which Child B described as a method to prevent them from eating. This prompted the youngest to squeeze through a vent to escape the confinement and scavenge for food in the garbage, which he then brought back to his brothers. There were also alarms on the bedroom door. Furthermore, Appellant installed latches on the refrigerator and freezer. In order to further secure the refrigerator and freezer against the children's attempts to satisfy their hunger, he utilized locks which required keys to be opened.

**{¶55}** This court concludes Appellant's serving of inadequate meals and his failure to feed the children enough times a day in combination with the above active measures (some of which were based upon discipline) ensured the children's regular starvation. Viewed in the light most favorable to the prosecution, a rational fact-finder could find the element of abuse was satisfied. This assignment of error is overruled.

ASSIGNMENT OF ERROR THREE: SUFFICIENCY ON "IN LOCO PARENTIS"

**{¶56}** In addition to three counts of child endangering by abuse of a child in violation of R.C. 2919.22(B)(1), Appellant was found guilty of three counts of child endangering under R.C. 2919.22(A). The trial court merged these lesser-degreed felonies at sentencing. The next two assignments of error, raising sufficiency and weight of the evidence, relate to the charges under division (A). As to sufficiency of the evidence, Appellant's third assignment of error alleges:

"The state failed to present sufficient evidence that Appellant was in loco parentis relative to each of the three children for the charges pursuant to R.C. 2919.22(A) thereby defeating the guilty finding and requiring reversal."

**{¶57}** Pursuant to R.C. 2919.22(A): "No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." *See also* R.C. 2919.22(E)(2)(c) (if violation of division (A) results in serious physical harm to the

child, the offense is a third-degree felony). Appellant contends the state failed to set forth sufficient evidence to show the relationship which would give rise to a duty under the statute. For the definition of "in loco parentis," Appellant cites the Supreme Court's *Noggle* case, which set forth the following definition of the phrase:

> The term 'in loco parentis' means 'charged, factitiously, with a parent's rights, duties, and responsibilities.' Black's Law Dictionary (6 Ed.1990) 787. A person in loco parentis has assumed the same duties as a guardian or custodian, only not through a legal proceeding. A 'person in loco parentis' was grouped with guardians and custodians in the statute because they all have similar responsibilities.

*State v. Noggle*, 67 Ohio St.3d 31, 33, 615 N.E.2d 1040 (1993).

**{¶58}** The Court concluded the "in loco parentis" phrase "applies to a person who has assumed the dominant parental role and is relied upon by the child for support." *Noggle*, 67 Ohio St.3d at 33. "This statutory provision was not designed for teachers, coaches, scout leaders, or any other persons who might temporarily have some disciplinary control over a child. Simply put, the statute applies to the people the child goes home to." *Id.* (We note the legislature thereafter added a division applying to teachers and coaches where the other person is a minor.) Notably, the *Noggle* Court was applying the incest division of the sexual battery statute, which prohibited sexual conduct where "[t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." R.C. 2907.03(A)(3). *Compare* R.C. 2919.22(A) (the child endangering statute at issue herein, which has an additional offender option of a "person having custody or control").

**{¶59}** Appellant asks us to consider the following list of factors set forth by the Tenth District to assist in determining whether a person is acting "in loco parentis":

> (1) the person is charged with a parent's rights and responsibilities; (2) the person has assumed the same duties as a guardian or custodian; (3) the person has assumed a dominant parental role; (4) the child

relies upon the person for support; (5) the child "goes home" to the person; (6) the person's relationship with the child is close, supportive, and protective; (7) the person has the intention of acting as a parent, which is shown by the acts, conduct, and declaration of the person; (8) the person intentionally assumes the obligations incidental to the parental relationship; and (9) the person is the primary caretaker for the child while the biological parent is absent due to, for example, employment.

*State v. Abubakar*, 10th Dist. No. 11AP-440, 2011-Ohio-6299, ¶ 13 (also a case involving sexual battery rather than child endangering). In setting forth the list of factors, the Tenth District explained that financial support is not solely determinative of a person's status as in loco parentis, stating "[a] close, supportive, and protective in loco parentis relationship need not include provision for the material needs of the child." *Id.* at ¶ 10, citing *State v. Funk*, 10th Dist. No. 05AP-230, 2006-Ohio-2068, ¶ 70. *See also State v. Reinhardt*, 10th Dist. No. 04AP-116, 2004-Ohio-6443, ¶ 34 ("support" of a child for purposes of in loco parentis status is not limited to financial contributions; a person who fills the role of primary caretaker supports a child).

**{¶60}** Appellant argues: he was not the dominant parental figure; he was not the primary caretaker; any caregiving acts were in concert with the mother; the mother was in the home during the events of the case; although he did not work, neither did the mother; there was no indication he was alone with the children; he had a separate residence out of state; he had no authority relative to their education; and he had no income to contribute to the children's financial support as he was unemployed.

**{¶61}** The state responds by urging Appellant's statement alone provides sufficient evidence on the "in loco parentis" element. Appellant disclosed: he used his food stamps to help the mother; he was engaged to the mother; the children had not seen their biological father since he met the mother; the children called him "dad"; he installed the latches on the refrigerator and freezer; and he said "we" used locks to lock the children's bedroom (until Children's Services explained why "we" must stop

and gave "us" alarms instead). Appellant acknowledged he shared primary caregiver responsibilities with the mother. He helped watch the children outside and suggested it was his decision to keep them inside when it was too hot (as he referred to his own medical condition). In addition, he went to the children's medical appointments and even called the children's doctor seeking information on their medication after they were removed. Notably, he normally cooked dinner for the children.

**{¶62}** Furthermore, Appellant took the role of disciplining the children. He said he would talk to them and calm them down when they would not listen to the mother. He would impose time-outs. He was involved in the discontinuation of after-school snacks, the elimination of bed-time snacks as punishment, and the withholding of breakfast as discipline for waking up too late. He admitted to threatening the children and warning them he would withhold even more food due to their behavior. Appellant also suggested the mother had been participating in child care (and self-care) less since her daughter was removed in June 2015.

**{¶63}** In addition to Appellant's own statement, there was other evidence as to his role in the children's life. Although Appellant said he initially stayed with the mother and the children on occasion and began staying more continuously in August, there were indications he spent more time at the house than he suggested. For instance, he said they both helped the children get ready for school, transported them to and from school, and helped with homework. (This would not have been occurring over the summer, and the children were removed on the first day of the new school year.) The maintenance person, who lived in the unit above the children, considered Appellant his neighbor and believed Appellant lived there with the children (and left to visit his father and child on occasion). Appellant asked the maintenance person for help installing the latches and referred to locks he intended to use to keep the children out of the refrigerator and freezer.

**{¶64}** Child A reported how the food deprivation started when Appellant came into their lives, suggesting Appellant exercised control over the household. The testimony presented by Child A suggested Appellant ruled the children's lives, especially their food situation and their movements. Finally, Appellant attended

educational meetings for the children with the mother at the school. At one meeting, he (rather than the mother) responded to the voiced concern over the children's hunger. He also attended the back-to-school function with the children.

{¶65} As aforementioned, a sufficiency review considers whether the evidence was adequate to support the disputed element as a matter of law, as opposed to a weight of the evidence review which considers the persuasiveness of the evidence. *Thompkins*, 78 Ohio St.3d at 386-387. We must evaluate the evidence in the light most favorable to the prosecution and ask whether there was some evidence from which a rational fact-finder could find the elements of the offense proven beyond a reasonable doubt. *Goff*, 82 Ohio St.3d at 138.

{¶66} There was evidence Appellant had more than "temporar[y] disciplinary control over" the children. *See Noggle*, 67 Ohio St.3d at 33. He was one of "the people [each] child goes home to." *See id.* He lived with them, and they called him dad. Viewing the evidence and rational inferences most favorably to the prosecution, the trial court could rationally find Appellant should be "charged, factitiously, with a parent's rights, duties, and responsibilities" as he has "assumed the same duties as a guardian or custodian, only not through a legal proceeding" and he occupied a "dominant parental role." In addition, one can conclude he provided support to the children, in the form of food stamps; he also supported the children in the form of parental services such as cooking, household rule enforcement, and child care (even if the mother was present). *See id.* We can conclude there was sufficient evidence presented from which a rational person could conclude Appellant occupied the status of "in loco parentis" as to the three child-victims. Contrary to Appellant's argument, the evidence was sufficient as a matter of law to demonstrate he occupied the required role in the children's life. Accordingly, this assignment of error is overruled.

{¶67} Moreover, there is an optional relationship in the child endangering statute to satisfy this element: "person having custody or control." *See* R.C. 2919.22(A). We note the sexual battery statute at issue in *Noggle* did not contain this additional relationship option. The trial court's opinion on the relationship element focused on Appellant's "in loco parentis" status. Nevertheless, in finding Appellant

was the dominant parental figure, the court stated Appellant asserted authority over the children even though the mother was present in the household.

**{¶68}** On the relationship element, the Legislative Service Commission Comment following R.C. 2919.22 states, "in addition to the natural parents of the child, the first part of the section also covers guardians and custodians, persons having temporary control of a child and persons standing in the place of the parents." *State v. Banks*, 8th Dist. No. 97299, 2012-Ohio-2304, ¶ 22, quoting *State v. Reed*, 11th Dist. No. 89-L-14-130 (May 31, 1991). "[T]he phrase 'custody or control,' must mean something other than in loco parentis, or the phrase becomes superfluous." *State v. Schoolcraft,* 11th Dist. No. 91-P-2340 (May 29, 1992) (a babysitter's control alone was sufficient to satisfy the statutory relationship element, and there was evidence he continued to exercise control after mother returned home and they failed to seek medical treatment). *Compare State v. Amerson*, 8th Dist. No. 78235 (July 5, 2001) (a babysitter acted "in loco parentis").

**{¶69}** Viewing the evidence in the light most favorable to the state, a rational person could alternatively conclude there was sufficient evidence Appellant exercised control over the children, notwithstanding the mother's presence in the house, especially considering his statement as to the mother's physical and mental state for the two months prior to the children's removal. For this additional reason, this assignment of error is overruled.

ASSIGNMENT OF ERROR FOUR: WEIGHT OF EVIDENCE ON RELATIONSHIP

**{¶70}** Appellant fourth and final assignment of error asserts:

"Appellant's convictions for counts 1-3, pursuant to R.C. 2919.22(A), were against the manifest weight of the evidence as the State failed to produce convincing evidence that he had any duty to the children thereby defeating the guilty finding and requiring reversal."

**{¶71}** Even if a trial court's judgment is sustained by sufficient evidence, a defendant can argue the judgment is against the weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather

than the other." *Id.* It is not a question of mathematics but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion, whereas sufficiency involves the burden of production. *Id.* at 390 (Cook, J., concurring). The appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387.

{¶72} This discretionary power of the appellate court is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.* This is because "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). We therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we do not choose which one we believe is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

{¶73} Appellant incorporates his arguments from the prior assignment of error and concludes the decision to find him guilty of child endangering under division (A) of R.C. 2919.22 was against the manifest weight of the evidence because the evidence as to his parent-like relationship with the children was not weighty or persuasive. He contends the evidence pertinent to his role in the children's lives (giving rise to a duty) does not "induc[e] belief that he assumed the primary caregiver or dominant parental figure role."

**{¶74}** The state also incorporates the arguments set forth in responding to the prior assignment and concludes there was overwhelming evidence showing Appellant had assumed the role of "a person in place of a parent" at the time of the alleged acts. The state urges the trial court did not clearly lose its way in finding Appellant guilty of child endangering under division (A) of R.C. 2919.22.

**{¶75}** We too incorporate our observations set forth in the prior assignment of error and our statement of the case set forth earlier. Upon reviewing all of the evidence and the inferences reasonably drawn from the evidence, there is no indication the trial court clearly lost its way and created such a manifest miscarriage of justice that Appellant's conviction must be reversed. The evidence as to Appellant's relationship with the children was worthy of inducing belief. The trial court heard the testimony at trial and the recorded statement provided by Appellant. The evidence carried weight and induced a belief in the trial court that Appellant occupied a parent-like role in the children's life and controlled them fully and on a daily basis, all clearly satisfying the relationships of "in loco parentis" (and "person having custody or control"). This is not the exceptional case in which the evidence weighs heavily against the conviction. In accordance, Appellant's final assignment of error is overruled.

**{¶76}** For all of the foregoing reasons, the trial court's judgment is affirmed.


Donofrio, J., concurs.

DeGenaro, J., concurs.