[Cite as *State v. Mabrey*, 2011-Ohio-3849.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No. 96048

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## GENEVA MABREY

DEFENDANT-APPELLANT

---

**JUDGMENT:**
**AFFIRMED**

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-532828

**BEFORE:** Keough, J., Jones, P.J., and Rocco, J.

**RELEASED AND JOURNALIZED:** August 4, 2011

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik
Chief Public Defender

Nathaniel McDonald
Assistant Public Defender
310 Lakeside Avenue
Suite 400
Cleveland, OH 44113


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

Jesse W. Canonico
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH 44113

KATHLEEN ANN KEOUGH, J.:

{¶ 1}  Defendant-appellant, Geneva Mabrey ("Mabrey"), appeals from the common pleas court's judgment finding her guilty of child endangering. For the reasons that follow, we affirm.

{¶ 2}  In January 2010, Mabrey was charged with felonious assault in violation of R.C. 2903.11(A)(1) and child endangering, with a serious physical

harm specification, in violation of R.C. 2919.22(B)(1). The matter proceeded to trial before the bench. At the close of the State's case, the trial court granted Mabrey's Crim.R. 29 motion for judgment of acquittal on the felonious assault charge. The court found Mabrey guilty of child endangering, including the serious physical harm specification, and sentenced her to two years of community control sanctions.

{¶ 3} Mabrey appeals, contending that her conviction for child endangering was not supported by sufficient evidence and was against the manifest weight of the evidence. Mabrey does not contest the underlying facts of the case, but maintained at trial and now on appeal that she did not recklessly abuse the child, and that her actions and/or inactions were at most a violation of a duty of care to the child.

{¶ 4} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, Cuyahoga App. No. 92266, 2009-Ohio-3598, ¶12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 942, paragraph two of the syllabus.

{¶ 5} A manifest weight challenge, on the other hand, questions whether the prosecution met its burden of persuasion. *State v. Thomas*

(1982), 70 Ohio St.2d 79, 80, 434 N.E.2d 1356. A reviewing court may reverse the judgment of conviction if it appears that the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. A finding that a conviction was supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. Id. at 388.

{¶ 6} Mabrey was convicted of child endangering in violation of R.C. 2919.22(B)(1), which provides that "no person shall [abuse] a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age."

{¶ 7} The requisite culpable mental state for the crime of child endangering is recklessness. *State v. Adams* (1980), 62 Ohio St.2d 151, 153, 404 N.E.2d 144. R.C. 2901.22(C) provides that "[a] person acts recklessly when, with heedless indifference to the consequences, [s]he perversely disregards a known risk that [her] conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, [s]he perversely disregards a known risk that such circumstances are likely to exist."

{¶ 8} Therefore, "[t]o establish a violation of R.C. 2919.22(B)(1), the state must prove, beyond a reasonable doubt: (1) that the child is under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, (2) an affirmative act of abuse, and (3) which act was reckless, that is, perpetrated with heedless indifference to the consequences of the action." (Internal citations omitted.) *City of Newburgh Hts. v. Cole*, 166 Ohio App.3d 826, 2006-Ohio-2463, ¶8, quoting *State v. Bogan* (June 14, 1990), Montgomery App. No. 11920. It is undisputed that the child in this case was under eighteen years of age. Accordingly, the issue on appeal pertains to the second and third elements of the offense.

{¶ 9} The State argues that "an affirmative act of abuse" is not an element that must be proven in order to sustain a conviction under R.C. 2919.22(B)(1). In fact, the State asks this court to hold and declare that "an affirmative act of abuse" is not an element of the offense under R.C. 2919.22(B).

{¶ 10} "Abuse" is not defined by the criminal statutes. However, "abused child" is defined by the juvenile statutes as one who, "because of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens the child's health or welfare." *Cole* at ¶9, quoting R.C. 2151.031(D).

{¶ 11} The Legislative Service Commission Commentary to R.C. 2919.22 explained that child endangering under R.C. 2919.22(B) "deals with actual physical abuse of a child, whether through physical cruelty or through improper discipline or restraint, and regardless of by whom the offense is committed."

{¶ 12} Additionally, the Ohio Supreme Court in *State v. Kamel* (1984), 12 Ohio St.3d 306, 308-309, 466 N.E.2d 860, identified that "[i]t is not necessary to show an actual instance or pattern or physical abuse on the part of the accused in order to justify a conviction under R.C. 2919.22(A). Affirmative acts of torture, abuse, and excessive acts of corporal punishment or disciplinary measures are expressly covered under division (B) of the section." Accordingly, the Legislative Commentary and the decision in *Kamel* differentiate between sections (A) and (B) of R.C. 2919.22 and establish that an affirmative act of abuse is a required element for a conviction under R.C. 2919.22(B). Section (A) involves acts of omission, whereas section (B) involves acts of commission. *Kamel* at 309, citing *State v. Sammons* (1979), 58 Ohio St.2d 460, 391 N.E.2d 713.

{¶ 13} Although we disagree with the State's assertion that an affirmative act of abuse is not an element of child endangering under R.C. 2919.22(B), we find that Mabrey's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 14} The evidence and testimony established that Mabrey, a licensed practical nurse, provided home care to J.L.,[1] a special needs child, since he was eight months old. J.L. was born prematurely and suffers from a variety of health problems, as well as cognitive disability and impairment. Although J.L. is somewhat verbal, he cannot comprehend and answer questions. As a result of his conditions, J.L. was part of MetroHealth Medical Center's Comprehensive Care program, a multi-disciplinary program designed to address the needs of children like J.L.

{¶ 15} On April 23, 2008, Mabrey was providing care to J.L., then five-years old, in her home. Around 9:00 p.m. and after J.L. experienced both bowel and urinary incontinence, Mabrey placed J.L. in the bathtub with approximately ten inches of cool water, which was enough to cover the lower part of his body. According to Mabrey's statement to police, she bathed him and then allowed him to play with his toys in the bathtub. J.L. turned the cold water on while playing, adding an additional one to two inches of cold water. Because J.L. kept "bothering the cold water," Mabrey told J.L. that it was time to get out of the bathtub. As he stood up, he lost his balance and fell to the side of the bathtub, hitting his mouth, falling on his back, and going under the water. As Mabrey pulled J.L. out of the bathtub, he was spitting up water. She wiped his face and he began to shake and then

---

[1]We use initials to protect the identity of the minor involved in this incident.

became quiet. Because he would not stand up and kept spitting up water, she took him to the kitchen and called 9-1-1. According to Mabrey, J.L. was in the bathtub for approximately 15 to 20 minutes and she never left him alone during this time.

{¶ 16} Euclid dispatch received a 9-1-1 call from Mabrey at 10:12 p.m. Mabrey told the dispatcher that J.L. had gone underwater. When the paramedics arrived, J.L. was naked and sitting on the counter cradled in Mabrey's arms.

{¶ 17} Euclid firefighter and paramedic, Gregory Ivanovics, who was first on the scene, testified that when he took J.L. from Mabrey, J.L. was damp and "very cold to the touch through my [nonlatex] glove." Ivanovics immediately carried J.L. to the ambulance to begin treatment. Ivanovics testified that his assessment of J.L. was that he (1) was cold to the touch, (2) had his teeth and jaw clenched and clamped on his tongue, (3) had saliva and vomit around his mouth, (4) was "very cyanotic. His lips were very blue," and (5) had a fast and weak pulse. He testified that he did not observe any blood, bruises, abrasions, or scratches on J.L.'s body. According to Ivanovics, he "never experienced anything like that before."

{¶ 18} EMS transported J.L. to Euclid Hospital where Bridgette Stemple (f.k.a. Davis) was a treating nurse. She testified that the initial call from Euclid Fire and Rescue stated that they were transporting a child who was

"submerged in a tub for an unknown length of time." When J.L. arrived at Euclid Hospital, Stemple conducted a head to toe assessment and observed that J.L. was small, very cold, had multiple abrasions and small scrapes on his arm and buttocks, had clenched teeth, and had a rapid heart rate. Stemple testified that J.L.'s core body temperature , which was taken approximately thirteen minutes after the 9-1-1 call was placed, registered at 28.9 degrees Celsius, which is approximately 84 degrees Fahrenheit. Stemple characterized J.L.'s temperature as "hypothermic, very, very low" and testified that at that temperature, multiple systems within the body are shutting down. J.L. was transported by Life Flight to MetroHealth approximately 30 minutes later.

{¶ 19} Euclid police officer Michael Walsh testified that at 10:14 p.m. on April 23rd he responded to an emergency call at Mabrey's residence. When he arrived, EMS was treating a child in the ambulance on scene. Officer Walsh testified that he spoke with an "upset" Mabrey who told him that J.L. had gone underwater for a few seconds as she was giving him a bath. Because J.L. was unresponsive, she called 9-1-1. Officer Walsh looked in the bathroom, but saw no standing water in the bathtub.

{¶ 20} Detective Brent Figueira testified that he received a call for a child nearly drowning and he and his partner went to MetroHealth, where they found Mabrey. After speaking with Mabrey, she gave them a written

statement regarding the incident. At that time, Detective Figueira treated this case as a near-drowning incident. Approximately five days later, "the drowning investigation changed to a case where the child suffered hypothermia due to some mechanism."

{¶ 21} Angela Colon, special investigator for Cuyahoga County Department of Children and Family Services, was assigned to investigate the circumstances surrounding this incident. She testified that it was reported to her that J.L. was found in the bathtub and that he almost drowned. Accordingly, the case was classified as an allegation of neglect as an emergency.

{¶ 22} On April 24th, Colon interviewed Mabrey and informed her that she was named as an alleged perpetrator for allegations of neglect regarding the possible drowning of J.L. Colon testified that she did not learn of J.L.'s injuries until after speaking with Mabrey on April 24th. According to Colon, Mabrey was visibly upset and cried during the interview, but was cooperative and respectful in answering all her questions. Mabrey told Colon that she put J.L. in the bathtub to bathe him and that she made the water a little cooler because it was a warm day. Mabrey told her that J.L. kept playing with the faucet, drained the water out of the bathtub, and added more cold water. Mabrey denied leaving J.L. unsupervised. Mabrey told Colon that J.L. had a tendency to "duck under water" but when he went to get out of the

bathtub, he slipped. When she got him out of the bathtub, he spit some water out and his eyes appeared "funny." Because he would not stand up, she wrapped him up, and carried him to the kitchen to call 9-1-1. As she carried him, J.L. was "fighting" and kicking her.

{¶ 23} Colon testified that after learning J.L. suffered hypothermia during the incident, she interviewed Mabrey again on May 22nd. During this interview, Colon observed the bathroom and bathtub area and took the temperature of the cold water from the bathtub faucet, which registered at 48 degrees Fahrenheit. She asked Mabrey to go over the events again regarding the incident.

{¶ 24} Mabrey told her that she thought J.L. was in the bathtub for 20 minutes or more, but then later said she was unsure how long J.L. was in the bathtub. In this interview, Mabrey told Colon that while J.L. played in the bathtub, she sat doing her paperwork in the bathroom and never left him unattended. She also told Colon that she had her cell phone with her in the bathroom. Again Mabrey told her that J.L. was playing with the cold water and that he drained the water out of the bathtub and refilled it with all cold water.

{¶ 25} Mabrey stated J.L. had a habit of throwing himself under the water and when he would not stand up, she got concerned. Mabrey told her that he fell getting out of the bathtub, but now stated that he fell forward and

hit his mouth. Mabrey assumed J.L. hit his mouth because she saw blood on his lip. Mabrey said J.L. appeared to have swallowed some water, so she grabbed him from the bathtub and he was grasping for breath. When she got him out of the bathtub, his teeth were completely clenched and he was trembling. She told Colon that he was not trembling in the bathtub and she thought maybe he was trembling due to the fall. Mabrey told Colon that she did not think J.L. had a seizure. He was unresponsive, so she took him to the kitchen to call 9-1-1. She told Colon that she did not perform CPR on J.L. because he was breathing. Mabrey told Colon that J.L. appeared "real cold."

{¶ 26} Colon testified that she felt there were questionable actions and inconsistencies in Mabrey's different version of events, specifically (1) if Mabrey had her cell phone in the bathroom, why Mabrey would use the kitchen phone, (2) the amount of time J.L. was in the bathtub, and (3) the event of J.L. falling. Based on Colon's investigation, CCDCFS ruled that "allegations of neglect were indicated."

{¶ 27} The State's trial theory was that Mabrey used a cold water bath abusively or to punish J.L. The State called Dr. Mark Feingold, member of MetroHealth's Department of Pediatrics and Director of Child Protection Services, as a pediatric expert in diagnosing child abuse. Dr. Feingold testified that he became involved in the case because J.L. was admitted into

the pediatric intensive care unit due to severe hypothermia. Dr. Feingold testified that he reviewed J.L.'s medical records in connection with this incident and conducted a physical examination of J.L., but the examination revealed nothing specific for child abuse.

{¶ 28} However, based on the medical records, he learned that J.L. suffered hypothermia with a core body temperature of 28.6 degrees Celsius, which translated to 83.5 degrees Fahrenheit. Dr. Feingold testified that the event history provided by Mabrey was not consistent with J.L.'s core temperature because "he was simply too cold." According to Dr. Feingold, a core body temperature to drop to 84 degrees Fahrenheit is indicative of two plausible situations: (1) that the person has died and the temperature is lowering as time passes, or (2) that the person was exposed to external cold. Dr. Feingold testified that the first stage of hypothermia is just being cold, i.e. shivering and teeth chattering. The next stage is more severe hypothermia where the body temperature lowers and the person has mental confusion, combativeness, unreasonable behavior, and loss of spontaneous movement.

{¶ 29} Dr. Feingold indicated in his assessment notes that he was unable to determine what happened to J.L.: "1. The precise nature of what occurred on the evening of admission is still not clear. What is remarkable, however, is the profound, life-threatening hypothermia present on arrival at

the local emergency department. Voluntarily playing in cold water would not lower his core temperature to this extent."

{¶ 30} Dr. Feingold testified that there were several possibilities as to how J.L.'s body temperature reached such a low level: "Was he being forced into cold water as some sort of punishment? Possibly so. Was he under water for longer than reported? Also possibly so, but his relatively benign course does not suggest a lengthy immersion. Was he slightly chilled by playing in the water before he slipped and fell, and was the phone call for EMS assistance postponed? Again, possibly so. There is no solid data on exactly how fast a child's core temperature will fall either with external chilling or cardio-respiratory arrest, but a rectal temperature of 29 C (8 degrees below normal) would surely have to require a significant length of time and not mere minutes."

{¶ 31} Dr. Feingold did not render an opinion regarding whether this was a case of child abuse; however, he did render an opinion regarding the amount of time J.L. was subjected to external cold. He opined that based on J.L.'s body size, the temperature of the water, and the amount of water he was immersed in, it would take approximately one hour for a core body temperature to lower to the extreme suffered by J.L. He opined further that a person experiencing hypothermic symptoms in a bathtub would

instinctively get up and get out of the situation or express serious objections to the cold.

{¶ 32} In this case, the evidence was undisputed. J.L. was in a bathtub of cool water for a period of time that caused his core body temperature to lower to a life-threatening range. Whether the State satisfied its burden of proving the elements of R.C. 2919.22(B)(1) is an issue for the trier of fact. However, the proof for each element must be analyzed in light of the nature of the physical act relative to the substantial risk of harm, whether the act was justified by the underlying circumstances, and whether the act was recklessly perpetrated. *Bogan*, citing *In the Matter of Kimberly Noftz, Alleged Abused Child* (Aug. 22, 1986), Huron App. Nos. H-85-26 and H-86-11.

{¶ 33} This court reviewed a similar case in *State v. Parker* (July 8, 1999), Cuyahoga App. No. 74294, where the defendant was charged with child endangering after placing a child in a bathtub of hot water. This court stated that "[i]t is reckless to put a child into bath water that has not been tested and abusive to immerse a child in scalding hot water." Id.

{¶ 34} Although J.L. did not suffer from burns like the child in *Parker*, we find that Mabrey acted recklessly in failing to adequately supervise J.L. while he played with the bathtub's water faucet handles. J.L. could have easily turned on the hot water and scalded himself. The special needs required by J.L., his limited verbal skills, and cognitive ability, demanded

more supervision than what Mabrey provided. We also find it abusive to sit and watch a child freeze to the point that his body temperature lowers to a life-threatening stage. Based on the inconsistencies in Mabrey's different version of events, coupled with the undisputed medical evidence and time frames in which these events occurred, any rational trier of fact could have found that Mabrey acted recklessly perpetrating this act of abuse without heed to the potentially grave and life-threatening consequences. The uncontroverted medical evidence and testimony showed that the extreme state of hypothermia J.L. suffered resulted from immersion in and lengthy exposure to cold bath water.

{¶ 35} The weight of the evidence also supports Mabrey's conviction. The evidence submitted at trial, which tended to show the child's injuries resulted through Mabrey's recklessness, was reliable and credible. J.L. was in Mabrey's care when he suffered severe hypothermia. There was no other logical explanation presented as to how J.L.'s core temperature reached this life-threatening level. It is especially troubling that Mabrey was a licensed practical nurse; due to Mabrey's profession, she should have known and appreciated the risk of allowing a child to remain in cold water for such a long period of time.

{¶ 36} Accordingly, we find that the trial court had before it sufficient and substantial evidence from which it could reasonably find that the

requisite elements of child endangering were proved beyond a reasonable doubt and that the court did not lose its way in finding Mabrey guilty of child endangering in violation of R.C. 2919.22(B)(1). Mabrey's assignments of error are overruled.

Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


KATHLEEN ANN KEOUGH, JUDGE

LARRY A. JONES, P.J., and
KENNETH A. ROCCO, J., CONCUR