[Cite as *State v. Bracy*, 2018-Ohio-2542.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No. 28745 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DAVONTE S. BRACY | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR-2016-08-2563 |

DECISION AND JOURNAL ENTRY

Dated: June 29, 2018

CARR, Judge.

**{¶1}** Defendant-Appellant Davonte Bracy appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

**{¶2}** On July 18, 2016, four-year old M.E. suffered second degree burns from being exposed to hot water in a bathtub. In August 2016, in relation to the foregoing incident, Bracy, who was M.E.'s mother's boyfriend and who was home with M.E. at the time of the incident, was indicted on two counts of endangering children, one in violation of R.C. 2919.22(B)(1), and one in violation of R.C. 2919.22(A). The matter proceeded to a jury trial, at which the jury found Bracy guilty of both counts. The trial court determined that the two counts merged for purposes of sentencing and sentenced Bracy to three years in prison on count one.

**{¶3}** Bracy has appealed, raising a single assignment of error for our review.

## ASSIGNMENT OF ERROR I

THE CONVICTIONS FOR CHILD ENDANGERING SHOULD BE REVERSED BECAUSE THEY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND BECAUSE THE EVIDENCE SUPPORTING THEM WAS INSUFFICIENT AS A MATTER OF LAW TO PROVE A CONVICTION BEYOND A REASONABLE DOUBT.

{¶4}    Bracy argues in his sole assignment of error that his convictions for endangering children are based on insufficient evidence and against the manifest weight of the evidence because the evidence failed to establish that Bracy acted recklessly.  As Bracy has limited his argument to the evidence related to the element of recklessness, we will limit our analysis accordingly.

**Sufficiency**

{¶5}    When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id*. at paragraph two of the syllabus.

{¶6}    Bracy was found guilty of violating R.C. 2919.22(A) and 2919.22(B)(1).  In addition, with respect to both counts, the jury found that Bracy's actions resulted in the victim suffering serious physical harm.  That finding elevated count one to a felony of the second

degree, *see* R.C. 2919.22(E)(2)(d), and count two to a felony of the third degree. *See* R.C. 2919.22(E)(2)(c).

{¶7}   R.C. 2919.22 provides in relevant part:

(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.  It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.

(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

(1) Abuse the child[.]

R.C. 2919.22(A), (B)(1).

{¶8}   While the relevant portions of the statute do not include a culpable mental state, the applicable mens rea has been determined to be recklessness. *See State v. McGee*, 79 Ohio St.3d 193, 195 (1997) (R.C. 2919.22(A)); *State v. Jones*, 9th Dist. Summit No. 25986, 2012-Ohio-4256, ¶ 6 (R.C. 2919.22(B)(1)).  R.C. 2901.22(C) states that:

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature.  A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

"Recklessness, like any other essential element of an offense, may be proved through circumstantial evidence." *Jones* at ¶ 6.

{¶9}   On the morning of July 18, 2016, M.E.'s mother discovered that M.E. had wet herself and the bed.  M.E.'s mother got ready for work and, as she was leaving, she woke up Bracy and advised him of M.E.'s accident.  At the time, Bracy had been staying at M.E.'s

mother's home about five or six nights a week. Bracy would often watch M.E. Once M.E.'s mother left, Bracy and M.E. were then the only ones in the home.

{¶10} After M.E. had some cereal, Bracy, whom M.E. called "Boo," turned on the water in the bathtub and told M.E. to take off her clothes and get in the tub. M.E. was capable of getting into and out of the bathtub by herself, although M.E.'s mother testified that M.E. had more difficulty getting out of the bathtub than in it. According to Bracy, he then left the room with M.E.'s cereal bowl and went in the kitchen to do some dishes. Shortly thereafter, Bracy heard sounds he described as a "thud" and a "thump[.]" He proceeded to the bathroom to check on M.E.

{¶11} According to Bracy, he found M.E. in the tub on her back moving her arms rapidly above her trying to get out of the tub; she was also kicking and splashing water around. The bathroom floor was completely wet. Bracy also noticed that "the water was [so] hot that it was kind of smoking." Because Bracy was concerned that M.E. might be drowning, he pulled her out of the bathtub by one arm. M.E. was not screaming and was not initially really crying; but Bracy told police that M.E. "had her cry face on." As Bracy was drying M.E. off, he noticed that the skin was peeling away from her toe. He then removed the towel and noticed the burns on M.E.'s back and buttocks.

{¶12} Bracy then called M.E.'s mother, who had just arrived at work, and told her that she had to come home because the bath water was too hot and M.E. got burned. Bracy also sent M.E.'s mother a photograph of the injury. Bracy did not want to call 911 because M.E.'s mother was in AMHA housing and Bracy was not supposed to be there. Later, Bracy would tell the police that "he turned the hot water on and didn't check the temperature" and acknowledged that "it was his fault and he had made a mistake." Bracy told police that "he should have checked the

water." Bracy was aware that, prior to the incident, M.E.'s mother had called maintenance about the water because it got too hot. In fact, through the investigation, police learned that M.E.'s mother and Bracy had taken a shower the day before and he had mentioned to M.E.'s mother that the water was really hot.

{¶13} M.E.'s mother returned home and picked up M.E., who was not crying, but was "weeping[.]" As they were leaving, M.E. asked for her great grandmother and so M.E.'s mother drove to M.E.'s great grandmother's house and picked her up prior to driving to the hospital. M.E.'s mother testified that when she asked M.E. what happened, M.E. told her that Bracy turned the water on, told M.E. to get in the tub, and walked out of the room. M.E. then got in the tub. As M.E. was getting a toy, she slipped and fell on soap. When M.E.'s mother asked M.E. if she was purposely hurt, M.E. said, no and indicated that Bracy was not in the room.

{¶14} At the hospital, M.E. was admitted into the burn unit with second degree burns. M.E. stayed in the hospital for almost two weeks, as she had to be sedated to change the dressings due to the significant pain changing the dressings caused her. The burns began in the upper right part of her back, extended to the mid part of her back on both sides, and continued down to her left lower back and buttocks. There was also a burn noted on the toes of her left foot.

{¶15} One of M.E.'s medical providers, based on a suspicion of child abuse, sought a consult from Dr. Paul McPherson, who was the division director of the CARE Center at Akron Children's Hospital and an expert in child abuse pediatrics. There was concern that the burn pattern injury did not appear consistent with an accident. On July 21, 2016, Dr. McPherson conducted an evaluation. Dr. McPherson looked at M.E.'s medical history, spoke with M.E.'s great grandmother, and did a physical exam on M.E. M.E.'s mother was not at the hospital at the

time and thus was not interviewed by Dr. McPherson. So that Dr. McPherson would not have to remove M.E.'s dressings, he looked at photographs of her injuries instead of the injuries themselves.

{¶16} With respect to how M.E. was injured, Dr. McPherson testified that M.E.'s great grandmother told him that Bracy told her that he had turned on the water, told M.E. to get in, and left the room. M.E. then slipped on soap and fell into the water causing the burns. Bracy was not in the room when M.E. fell in the water. Dr. McPherson also spoke to M.E., whom Dr. McPherson described as developmentally appropriate for her age. M.E. told Dr. McPherson that she slipped on some soap and fell in the tub. However, she went on to tell Dr. McPherson that "Boo * * * pushed her head down into the tub. She wanted to get out of the tub but he wouldn't let her because he kept pushing down on her head and would not let her get up." M.E. demonstrated with her hands and head how Bracy "kept her head down in the tub to make her stay inside the bathtub."

{¶17} Dr. McPherson ultimately concluded that the burn injuries "were not consistent with an accidental burn and were very concerning for nonaccidental burn or abusive burn injury." Dr. McPherson stated that M.E.'s statement, the lack of significant splash marks, the burn pattern, and her developmental abilities were key in his determination that the risk of abusive burns was "extremely high" and that the injuries were consistent with child abuse. Dr. McPherson indicated that, very often in accidental burn injuries, a "splash burn or splash pattern" is seen. As an example, Dr. McPherson testified that, if someone slipped and fell in a tub and immediately got out, that person might have splash burns in an area of the body that was otherwise unaffected. Dr. McPherson observed that M.E. did not have any evidence of splash burns. However, Dr. McPherson did agree that the presence or absence of splash burns would be

dependent on the temperature of the water and the length of time the skin was exposed to the water.

{¶18} Dr. McPherson additionally pointed to the burn pattern in support of his conclusion that M.E.'s injuries were not accidental. From the pattern of the injury, it appeared that M.E.'s body was in a twisted position when she was in the water, which, as noted in his report, could be consistent with the statement given by M.E. He noted that someone in very hot water would try to minimize contact with the water. He concluded that the areas of M.E.'s body that were unaffected were areas that she was able to keep out of the water.

{¶19} Finally, Dr. McPherson noted that a four year old with normal development, like M.E., had the ability to climb into and out of the bathtub. Thus, if M.E. had fallen in the water, and the water was hot, and no one was holding her in the water, she would have been able to remove herself from the tub. While Dr. McPherson could not say for certain what M.E.'s injuries would be like if they were attributable to an accident, he could say that he would not expect to see the burn patterns he saw on M.E.

{¶20} Dr. McPherson additionally testified that M.E. would have been in a significant amount of pain and that she would likely be visibly upset and crying. Dr. McPherson was unable to determine the temperature of the water or how long M.E. was in the water. He indicated that the hotter the water, the quicker M.E. would have suffered second degree burns. Dr. McPherson testified that studies indicated that a person exposed to water at a temperature of 130 degrees Fahrenheit would suffer third degree burns after 30 seconds and at 150 degrees Fahrenheit that person would suffer third degree burns after only 2 seconds. He also indicated that hot water tanks could be set at 160 degrees Fahrenheit.

{¶21} After M.E. was released from the hospital she went to stay with a relative; however, M.E.'s mother was able to visit her. M.E.'s mother continued to reside with Bracy, and while she did not blame him for what happened, she did believe that he made a mistake.

{¶22} The trial court found M.E. competent to testify at trial and she did testify. However, her testimony was sometimes inconsistent. In addition, M.E. would often respond by saying she did not know or did not want to talk about it, particularly when asked details about the incident. She even indicated on occasion that she would not tell the truth, even though she had earlier promised to tell the truth. When initially asked what happened to her back she indicated that she was at her mother's house and Boo was there. When she got in the bathtub, it was hot and she was trying to get out and could not do so. When asked why she could not get out, she stated that she did not want to talk about it. When further questioned, M.E. provided several nonverbal responses and stated that she did not know or did not remember. M.E. then indicated that she was scared.

{¶23} In light of M.E.'s concerns, thereafter, M.E. testified from a small room. Her testimony was visible to the jury via Skype. At times, M.E. seemed to be distracted and had to be reminded to pay attention and answer the questions. When the prosecutor proceeded to again ask M.E. how she hurt her back, she indicated that she did not remember. M.E. was asked if she remembered several other things, including getting in the bathtub and going to the hospital, and she answered that she did not. However, M.E. agreed that it was true that she was home with Boo. When asked who Boo was, M.E. responded that he was "the boy that burnt me." The prosecutor then asked her why she said that and M.E. replied, "because of the hot water." Thereafter, M.E. responded that she did not know or could not remember to several questions related to her and the bathtub. M.E. did not remember why she got in the bathtub, why she did

not get out, or if she tried to get out. She did remember that the water was hot and that Boo turned on the water.

{¶24} When questioned by defense counsel about who Boo was, M.E. repeated that he was "[t]he boy who burnt me." However, M.E. responded to several additional questions by saying she did not want to talk about it. She did indicate that she got in the bathtub on her own, that the water was hot, that Boo was in the bathroom when she got in the tub, and that she did not slip on soap. However, she did not know how full the bathtub was. When asked questions about Bracy, such as whether she liked him and wanted to see him, she responded that she did not want to talk about it. On redirect, M.E. testified that she could not get out of the bathtub on her own and denied telling the doctor that Boo held her head and would not let her get out of the tub. However, M.E. averred that it was the truth when she stated that Boo was the boy who burnt her. When further questioned by defense counsel, M.E. indicated that Bracy turned on the water, she got in the bathtub, and Bracy left and went to the kitchen. He then came back in the bathroom and she was trying to get out of the tub. However, when asked if he told her to stay in the tub or if he pushed her in the tub, M.E. responded that she did not know.

{¶25} After considering all of the evidence in a light most favorable to the prosecution, we conclude that sufficient evidence was presented whereby a jury could find beyond a reasonable doubt that Bracy acted recklessly. There was evidence that Bracy was aware that M.E.'s mother had called maintenance because the water was so hot. There was also testimony presented that, the day prior to the incident, Bracy and M.E.'s mother took a shower and Bracy commented about how hot the water was. Notwithstanding that knowledge, Bracy failed to check the water temperature of M.E.'s bathwater. We note that there have been cases with similar facts wherein the evidence was found to be sufficient to establish child endangering

under R.C. 2919.22(A). *See State v. Peters*, 12th Dist. Butler No. CA96-08-167, 1997 Ohio App. LEXIS 2588, *7 (June 16, 1997); *see also State v. Newman*, 9th Dist. Lorain No. 92CA005430, 1993 Ohio App. LEXIS 3105, *8-9 (June 16, 1993).

{¶26} However, the facts here, if believed, are even more compelling. In addition to the foregoing, there was the testimony of Dr. McPherson, who relayed his expert opinion that M.E.'s injuries were "very concerning for nonaccidental burn or abusive burn injury." He based that opinion in part on M.E.'s statement to him. M.E. told Dr. McPherson that Bracy pushed her head down in the tub and that she wanted to get out but Bracy kept pushing on her head to keep her in the bathtub. While this act would arguably constitute intentional conduct, courts have observed that "[w]hen recklessness suffices to establish an element of an offense, then knowledge or purpose is also sufficient culpability for such element." *State v. Stefanopoulos,* 12th Dist. Butler No. CA2011-10-187, 2012-Ohio-4220, ¶ 27; *see also State v. O'Brien,* 11th Dist. Lake No. 2011-L-011, 2013-Ohio-13, ¶ 111 (noting that "conduct done 'knowingly' encompasses conduct performed recklessly"); *State v. Ripperger,* 12th Dist. Butler No. CA2007-11-304, 2009-Ohio-925, ¶ 25 ("The jury finding that [the defendant's] acts were purposeful or knowing surpassed the recklessness the state actually had to prove in regard to the use or threat of use of force, and further demonstrated that the state offered evidence at the trial which spoke directly to [the defendant's] mental state."). In addition, we note that at the time M.E. was in the bathtub, Bracy himself acknowledged that the water was so "hot that it was kind of smoking." Given those foregoing circumstances, we can only conclude that there was sufficient evidence presented that Bracy acted recklessly. *See* R.C. 2901.22(C).

**Manifest Weight**

{¶27} Accordingly, we turn to examining the weight of the evidence.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶28} Bracy has failed to develop a separate argument with respect to manifest weight. *See* App.R. 16(A)(7). Instead, his entire argument appears to be focused on whether there was sufficient evidence that Bracy was reckless. While Bracy points out that M.E.'s trial testimony differed from the statement she provided to Dr. McPherson, Bracy develops no argument based upon credibility or the weight to be given any piece of evidence. Nonetheless, we have independently reviewed the evidence and cannot say that the jury's verdicts were against the manifest weight of the evidence. "While the jury was presented with conflicting evidence, [w]e remain mindful that the jury had an opportunity to view the witnesses and was in the best position to assess the credibility of the evidence presented by the parties at trial." (Internal quotations and citations omitted.) *State v. Garrett*, 9th Dist. Summit No. 28638, 2018-Ohio-1368, ¶ 15. It is true that M.E.'s testimony was not consistent with the statement she provided Dr. McPherson; however, the jury was aware that M.E. was very young and that she was having a difficult time testifying. The jury could have considered the foregoing in evaluating the

credibility of the testimony. We cannot say that the jury lost its way in making credibility determinations and finding Bracy guilty of the charges.

**{¶29}** Bracy's assignment of error is overruled.

III.

**{¶30}** Bracy's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

SCHAFER, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

NATHAN A. RAY, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.