[Cite as *State v. Laster*, 2024-Ohio-5912.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 113809 |
| EDWARD LASTER, JR., | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 19, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-678514-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Jamielle Lamson-Buscho and Owen Knapp, Assistant Prosecuting Attorneys, *for appellee*.

P. Andrew Baker, *for appellant*.

WILLIAM A. KLATT, J.:

{¶ 1} Defendant-appellant Edward Laster, Jr. ("Laster") appeals his conviction for child endangering following a bench trial. For the following reasons, we affirm.

**Factual and Procedural History**

{¶ 2} On March 1, 2023, a Cuyahoga County Grand Jury indicted Laster on one count of endangering children, a third-degree felony in violation of R.C. 2919.22(A), with a furthermore specification that the violation of R.C. 2919.22(A) "resulted in serious physical harm" to the victim. Laster initially pleaded not guilty to these charges.

{¶ 3} On February 15, 2024, Laster waived his right to a jury trial. Trial began the same day.

{¶ 4} The State's first witness was P.P., who testified that she is the mother of P. (d.o.b. 8/29/2017) and J.P., the victim in this case (d.o.b. 2/28/2019). P.P. testified that Laster is the father of P. and J.P. P.P. testified that on May 1, 2021, when both children were in Laster's care, she received a phone call from Laster. P.P. testified as follows about this phone call:

> Edward [Laster] told me that he was bathing [J.P.], and he didn't know that the water was too hot. And he showed me his back, and there was — at the time his skin was just peeling off, and he kind of was just trying to describe it, information.
>
> He was asking where did I want him to go to be seen and that — it was probably less than a ten-minute conversation.

{¶ 5} P.P. testified that Laster took J.P. to a hospital, but by the time she arrived they were already transferring J.P. to MetroHealth so that he could be treated in the burn unit. The State introduced photos taken of J.P. at MetroHealth, and P.P. confirmed that the blisters depicted in the photos were consistent with what she observed on her son. The State also introduced photos that P.P. took of J.P.

approximately six months before the trial showing extensive scarring on his back, neck, and the side of his face. P.P. testified that the photos were an accurate description of J.P.'s scarring at the time of trial.

{¶ 6} With respect to how exactly J.P. was burned, P.P. testified that Laster told her that he was rinsing J.P. off and did not know the water was too hot. P.P. testified that almost immediately after the incident, it was difficult to care for him because the tightness in his skin limited his mobility and made bathing him difficult. Additionally, P.P. testified that J.P. was "horrified" to get baths after the incident, and it took approximately one year before he could be bathed without screaming and trying to get out of the bathtub. P.P. testified that she eventually filed a police report based on the May 1, 2021 incident.

{¶ 7} The State also called Dr. Casey Kohler ("Dr. Kohler"), who testified that she works as a trauma and burn surgeon at MetroHealth. Dr. Kohler testified that she was working at MetroHealth when J.P. came in on May 1, 2021. According to Dr. Kohler, J.P. had partial thickness burns, or second-degree burns, on approximately 17 percent of his body. Dr. Kohler testified that J.P. had three small areas where they were initially concerned about third-degree burns, but they were ultimately deemed second-degree burns. Dr. Kohler explained that second-degree burns damage a good portion of the top layers of skin. She testified that J.P. required daily wound care, daily IV pain medication, and IV antibiotics because there was a concern for wound infection. Dr. Kohler testified that J.P. remained in the hospital for approximately one week.

{¶ 8} Dr. Kohler testified that J.P.'s injuries were the result of a scald burn from hot water. She further testified that generally, a water temperature of 125 degrees Fahrenheit can cause third-degree burns to a child after about two minutes, and a water temperature of 130 degrees can cause third-degree burns in about 30 seconds. She testified that the depth or degree of the burn is generally a result of the length of exposure or the temperature, so second-degree burns would generally be the result of a lower temperature or shorter exposure time. Dr. Kohler testified that J.P. has a higher risk for cancer in the areas of his body that were burned.

{¶ 9} The State called Tara Gower ("Gower"), who testified that she was an emergency department social worker employed at MetroHealth. Gower testified that she worked with J.P. and his family and prepared a report. Gower testified as to her report, in which she stated that J.P.'s paternal aunt, Joslyn, stated that J.P. and P. were being bathed after having accidents on themselves. Joslyn reported that Laster bathed P. first, gave P. to her, and then proceeded to bathe J.P. Further, the report states that per Joslyn, Laster "could not tell that the water was too hot because [J.P.] was already screaming and crying because [he] did not want a bath." Gower further testified that Laster reported to her that J.P. cries consistently when he is at Laster's house.

{¶ 10} Gower testified that her report identified four concerns: 1) a volatile family dynamic; 2) discrepancies in stories; 3) Laster's stress as a risk factor due to J.P.'s crying the whole time he is with Laster; and 4) a lack of bond with Laster. With respect to the second concern, Gower testified that there were discrepancies among

the stories she received from the transport team, Joslyn, and Laster. Specifically, Gower noted that Joslyn said that only one child was in the shower at a time, while Laster said that the children were in the shower together. Further, Gower testified that this case was one in which the level of J.P.'s injuries on their own warranted a call to the Division of Children and Family Services ("DCFS"). Gower testified that her concerns, and her call to DCFS, related only to J.P., and that her report stated that P.P. requested that P. be discharged to Laster.

{¶ 11} The State called Jessica Miller ("Miller"), who testified that she worked as a social worker for DCFS. Miller testified that she received J.P.'s case in May 2021. Miller testified that she saw J.P. and P.P., and she spoke to Laster on the phone but was unable to speak to him in person. Specifically, Miller testified that Laster hung up on her and declined to answer her subsequent follow-up phone calls. Miller testified that Laster told her that the incident was an accident, and she had no evidence that it was not an accident. Miller testified that ultimately, the allegations in the DCFS case were unsubstantiated because she could not find enough evidence of direct abuse or neglect by Laster.

{¶ 12} The State also called Detective Lance Estergall ("Estergall"), who testified that he worked for the Cleveland Division of Police as a detective in the sex crimes and child abuse unit. Estergall testified that this case was initiated when P.P. made a report, and Estergall was assigned to this case in August 2022. Estergall testified that his investigation was limited by the fact that the disclosure came about a year after the incident took place. As part of his investigation, Estergall visited

P.P.'s house so that she could sign a release for J.P.'s medical records. He also contacted Laster's attorney to set up a time to go to Laster's house and interview him, although that never took place, and he did not speak with Laster as part of his investigation.

{¶ 13} At the conclusion of the State's case, Laster made a Crim.R. 29 motion for acquittal, arguing that the State had not sustained its burden to prove that there was any recklessness from Laster. The court denied this motion.

{¶ 14} Laster called his sister, Joslyn, as a witness. Joslyn testified that she is Laster's sister, and at the time of the May 1, 2021 incident, she was living with Laster. Joslyn testified that at the time of the incident, P.P. had only recently started letting Laster see the children. According to Joslyn, J.P. was starting to get familiar with Laster but was still uncomfortable and would cry a lot. Joslyn testified that J.P. cried constantly, and Laster would try to comfort him.

{¶ 15} Joslyn testified that on May 1, 2021, she assisted Laster with bathing the children. Specifically, Joslyn testified that Laster bathed P., and Joslyn had J.P. in another room, and J.P. was crying and she was trying to comfort him. Laster then brought out P. and took J.P. into the bathroom to bathe him. Joslyn began to dry P. off, apply lotion, and start dressing her, when Laster yelled for her and she went into the bathroom. Joslyn testified:

> And he had showed me, you know, [J.P.'s] skin was, you know, burning a little bit.
>
> So we, you know, made sure he was calm because he got worried. And I'm like, okay, we going to — I'm like, call — you call P.P., and, you

know, I called my mom — our mom and dad so — to let them know what was going on, and we said, we're going to take him to a hospital.

Joslyn testified that Laster rode in the ambulance with J.P. while she went to pick up P.P. and drove P.P. and her mother to MetroHealth.

{¶ 16} Joslyn testified that Laster was happy to have time with his children, and there was nothing about his attitude that led her to believe that Laster would want to harm J.P.

{¶ 17} Laster also called Jessica Camargo ("Camargo"), who testified that she was the Guardian ad Litem ("GAL") assigned P.P. and Laster's custody case related to their custodial rights for J.P. and P. Camargo testified that she was appointed as GAL to this case in 2022 and remained on the case through the fall of 2023. Camargo testified that in her role as a GAL in that case, she met with both P.P. and Laster and members of their extended families, she reviewed records, and observed the children with and without the parents.

{¶ 18} Laster called Sheila Mason ("Mason") as a character witness. Mason testified that she is Laster's grandmother and works as chief of police in Woodmere, Ohio. Mason testified that Laster is a peacemaker and not aggressive at all. Mason testified that Laster takes care of Mason's other grandchild while her mother is working. She further testified that Laster is a loving father.

{¶ 19} Laster also called Garnetta Williams ("Williams") as a character witness. Williams testified that she was J.P.'s teacher and had been since September 2023. She testified that she has observed Laster with J.P. and described him as a

"very present parent" who is very calm and patient with J.P., even when J.P. is hyperactive.

{¶ 20} Finally, Laster testified on his own behalf. He denied ever hanging up on Miller, and he testified that Miller had in fact been to his house before. Laster further testified that on May 1, 2021, he tested the water temperature before bathing P., left the water on while he and Joslyn switched the children, and he did not test the water again before putting J.P. into the shower. Laster testified that P. was not scalded by the water, that he did not touch the knob to adjust the water temperature in between the children's baths, and that he had no explanation for the apparent change in temperature. Later on in his testimony, he stated that the water temperature at his house sometimes fluctuated.

{¶ 21} Laster testified that because he did not have a relationship with J.P. until shortly before the May 1, 2021 incident, and J.P. did not like being away from his mother, J.P. cried nearly constantly in Laster's care. Specifically, he testified:

> So giving him his shower and him crying, I assumed just like every other day. I wash him up, he cries. Put him to bed, he cries. So as I'm washing him and he's crying, I didn't think nothing was different until I saw something with his skin. I immediately shut the water off and grabbed him.
>
> I noticed his skin was peeling. I have never seen anything like this before. And I immediately called my sister and had a slight panic because it's my son, you know. I'm his father.

Laster testified that he took J.P. to the hospital and called P.P.

{¶ 22} On cross-examination, the State questioned Laster about his statement on the date of the incident, in which Laster stated that he turned around

to help P. and then turned back around and noticed burns on J.P. Laster testified that he did not recall making that statement. When confronted with other discrepancies between his testimony and his statement to doctors reflected in J.P.'s medical records, Laster testified that it was likely a miscommunication, and he was also hysterical when the incident occurred.

{¶ 23} The State recalled Miller, who testified that she never met with Laster at his home. She referred to case records showing that another social worker had visited the home. Miller also referred to her records, testifying that the case was closed because the incident appeared to be accidental, and P.P. also thought it was accidental.

{¶ 24} The defense rested, and Laster renewed his Crim.R. 29 motion. The court again denied the motion. The court began deliberating on February 16, 2024.

{¶ 25} On February 22, 2024, the court returned a verdict of guilty on one count of endangering children. The court referred Laster to the court psychiatric department for a presentence investigation.

{¶ 26} On March 13, 2024, the court held a sentencing hearing. The court heard from the assistant prosecuting attorney, defense counsel, and Laster. The assistant prosecuting attorney also addressed the court on behalf of P.P. and her mother. The court ultimately sentenced Laster to 18 months of community control. The court also imposed the following conditions on Laster:

> Defendant to perform court community work service for 100 hours.
> Submit to random drug testing arrest if/on: positive or too [diluted].
> Obtain/maintain verifiable employment, provide proof of employment

to the probation department. Participate and successfully complete an anger management program. Parenting classes. No marijuana use. Defendant to test negative for all drugs 4/28/2024 and thereafter. Visitation pursuant to juvenile court order. Defendant to install a thermostatic plumbing valve in shower and provide proof of the installation.

{¶ 27} Laster filed a timely notice of appeal and presents two assignments of error for our review:

I. Defendant-appellant's conviction was not supported by sufficient evidence.

II. Defendant-appellant's conviction was against the manifest weight of the evidence.

**Law and Analysis**

**I. Sufficiency of the Evidence**

{¶ 28} In Laster's first assignment of error, he argues that his conviction was not supported by sufficient evidence.

{¶ 29} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 30} With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.),

citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A sufficiency-of-the-evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

**{¶ 31}** Proof of guilt may be supported "by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Rodano*, 2017-Ohio-1034, ¶ 35 (8th Dist.).

**{¶ 32}** Here, the court found Laster guilty of endangering children in violation of R.C. 2919.22(A), which provides, in relevant part:

> No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a child with a mental or physical disability under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.

**{¶ 33}** To support a conviction for child endangering under R.C. 2919.22(A), there must be sufficient evidence that the defendant "(1) recklessly (2) created a substantial risk to the health or safety of one or more children (3) by violating a duty of care, protection or support." *State v. Lewis*, 2020-Ohio-5265, ¶ 37 (8th Dist.), citing *Cleveland Hts. v. Cohen*, 2015-Ohio-1636, ¶ 25 (8th Dist.).

**{¶ 34}** "Recklessly" is defined in R.C. 2901.22(C) as follows:

> (C) A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

{¶ 35} Laster argues that the "lapse" on his part does not rise to the level of recklessness. The State, in response, argues that there is ample case law holding that "it is reckless to put a child into bath water that has not been tested." *State v. Parker*, 1999 Ohio App. LEXIS 3231, *14 (8th Dist. July 8, 1999). While this court's opinion in *Parker* did include this statement, the convictions in *Parker* were also supported by ample evidence of other injuries, including "a fairly substantial blow to the side of the head." *Id*. at *6.

{¶ 36} In a similar case, *State v. Mabrey*, this court upheld a conviction for child endangering where the defendant "acted recklessly in failing to adequately supervise [the child] while he played with the bathtub's water faucet handles" and the child was in a bathtub of cool water for a period of time that caused his core body temperature to lower to a life-threatening range. *State v. Mabrey*, 2011-Ohio-3849, ¶ 34 (8th Dist.). While the circumstances were slightly different in *Mabrey*, this court found that "any rational trier of fact could have found that Mabrey acted recklessly perpetrating this act of abuse without heed to the potentially grave and life-threatening consequences" related to placing and keeping a child in water at an unsafe temperature.

{¶ 37} Laster attempts to distinguish this case from others in which child endangering convictions resulted from scalding bath water by pointing out that those cases, including *Parker*, involved additional evidence of other, potentially not accidental, injuries. Laster cites *State v. Bracy*, in which a child sustained second-degree burns from scalding bath water and there was testimony that the guardians

knew that the water temperature got dangerously hot and knew that they should have checked the temperature. *State v. Bracy*, 2018-Ohio-2542 (9th Dist.). In addition to this testimony, there was testimony from a treating physician that the child's burn injuries "were not consistent with an accidental burn and were very concerning for nonaccidental burn or abusive burn injury." *Id*. at ¶ 17. The court in *Bracy*, however, found that sufficient evidence was presented that the defendant acted recklessly based on the evidence that Bracy failed to check the water temperature despite knowing how hot the water could be. *Id*. at ¶ 25. While the court noted that the facts in *Bracy* were "even more compelling" due to the potential for intentional abuse, the court's finding that there was sufficient evidence was made independent of that evidence.

{¶ 38} While there is no allegation that the injuries J.P. sustained in this case were caused by an intentional act of Laster, there is evidence, in the form of Laster's own testimony, that he knew that the water temperature could sometimes fluctuate significantly. Therefore, even though he had checked the water temperature before bathing P., there was sufficient evidence presented that Laster acted recklessly by failing to check the water temperature before bathing J.P.

{¶ 39} Because there was sufficient evidence to support Laster's conviction, his first assignment of error is overruled.

## II. Manifest Weight

{¶ 40} In Laster's second assignment of error, he argues that his conviction was against the manifest weight of the evidence. In support of this assignment of

error, Laster notes that there was no testimony to establish how the water temperature injured J.P. but not P. Laster argues that because the water temperature did not injure P., it should not have been deemed reckless for him to not check the water temperature before bathing J.P.

{¶ 41} In contrast to a challenge based on the sufficiency of the evidence, "[w]eight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. . . . Weight is not a question of mathematics, but depends on its effect in inducing belief.'" *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *Thompkins*, 78 Ohio St.3d at 387. In our manifest-weight review of a bench trial verdict, we recognize that the trial court serves as the factfinder, and not the jury. *State v. Crenshaw*, 2020-Ohio-4922, ¶ 23 (8th Dist.). "'When considering whether a judgment is against the manifest weight of the evidence in a bench trial, an appellate court will not reverse a conviction where the trial court could reasonably conclude from substantial evidence that the state has proved the offense beyond a reasonable doubt.'" *State v. Worship*, 2022-Ohio-52, ¶ 34 (12th Dist.), quoting *State v. Tranovich*, 2009-Ohio-2338, ¶ 7 (12th Dist.). To warrant reversal from a bench trial under a manifest-weight-of-the-evidence claim, this court must determine that "the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Crenshaw* at *id*. "A conviction should be reversed as against the manifest weight of the evidence only in

the most 'exceptional case in which evidence weighs heavily against conviction.'" *Id.*, quoting *Thompkins* at 387.

{¶ 42} We do not find this to be the exceptional case in which evidence weighs heavily against conviction. The fact that P. escaped injury does not mean that Laster did not act recklessly in failing to check the temperature before bathing J.P. Further, while Laster argues that there is no testimony to establish exactly how J.P. was injured and P. was not, we note again that Laster himself testified that the water temperature in the shower sometimes fluctuated drastically. Moreover, where such an incremental difference in temperature can result in significant injury to a child, and where Laster testified that he initially thought that J.P. was crying because of something other than the water temperature and therefore only reacted when he saw the visible burns and peeling on J.P.'s skin, we cannot say that the trial court clearly lost its way. Because Laster's conviction was not against the manifest weight of the evidence, his second assignment of error is overruled.

{¶ 43} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
WILLIAM A. KLATT, JUDGE*

EILEEN T. GALLAGHER, P.J., and
MICHAEL JOHN RYAN , J., CONCUR

(*Sitting by assignment:  William A. Klatt, J., retired, of the Tenth District Court of Appeals.)